868 P.2d 1193

William S. RICHARDSON, Henry H. Peters, Oswald K. Stender, Myron B. Thompson, and Matsuo Takabuki, in their capacities as Trustees of the Kamehameha Schools/Bernice Pauahi Bishop Estate, Plaintiffs–Appellants,

v.

CITY AND COUNTY OF HONOLULU, a Hawai'i municipal corporation, Defendant–Appellee, and Hale Coalition, Intervenor–Appellee.

No. 16457.

Supreme Court of Hawai'i.

Feb. 18, 1994.

Reconsideration Denied March 7, 1994.

C. Michael Hare (Gail M. Tamashiro and Dennis J. Gaughan, with him on the briefs; of Cades, Schutte, Fleming & Wright), Honolulu, for plaintiffs-appellants.

Lex R. Smith (Bert T. Kobayashi, Jr. of Kobayashi, Sugita & Goda and Thomas P. Rack, Deputy Corporation Counsel, with him on the briefs), Honolulu, for defendant-appellee City and County of Honolulu.

Dennis E.W. O'Connor (Jerrold K. Guben, with him on the briefs; of Reinwald, O'Connor, Marrack, Hoskins & Playdon), Honolulu, for intervenor-appellee.

James K. Mee, Wayne P. Nasser and Teresa A. Quon of Ashford & Wriston, on the briefs, Honolulu, for amicus curiae Small Landowners of Oahu.

Carolee M. Aoki, A. Sonia Faust, Stanley H.C. Young and Joslyn V. Wood, Deputy Attorneys General, on the briefs, Honolulu, for amicus curiae State of Hawai'i.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.*

LEVINSON, Justice.

The United States District Court for the District of Hawai'i has certified a question of state law to this court. *See* Hawai'i Rules of Appellate Procedure (HRAP) 13 (1987).[1] In substance, the question is whether Ordinance 91–95 of the City and County of Honolulu,[2] relating, *inter alia*, to residential condominium leasehold conversion, is preempted by Hawai'i Revised Statutes (HRS) chs. 46, 101, 516, 516D, 519, 514A, or 421H, as interpreted in conjunction with the Hawai'i Constitution.

The plaintiffs-appellants William S. Richardson, Henry H. Peters, Oswald K. Stender, Myron B. Thompson, and Matsuo Takabuki (the Trustees), in their capacities as Trustees of the Kamehameha Schools/Bernice Pauahi Bishop Estate, urge that the question be answered in the affirmative. The defendant-appellee City and County of Honolulu (the City) and the intervenor-appellee HALE Coalition (the Coalition) urge a negative answer. For the reasons discussed below, we answer the question in the negative and rule that Ordinance 91–95 is not preempted by state law.

## I. BACKGROUND

On December 4, 1991, the Honolulu City Council enacted Bills 156 (1990) and 36 (1991), which became effective on December 18, 1991, as Ordinances 91–95 and 91–96, respectively. Ordinance 91–95 provides for the condemnation of a lessor's leased fee interest in leasehold condominium developments,[3] cooperative housing corporation de-

---

\* Circuit Court Judge Heely, who was assigned by reason of vacancy to sit with the justices of the supreme court pursuant to article VI, § 2 of the Constitution of the State of Hawai'i and HRS § 602–10 (1985), and who heard oral argument in this case, recused himself on December 8, 1993. The case was reargued before the present panel on February 16, 1994.

1. HRAP 13 (1987) provides in relevant part:

    *Rule 13. CERTIFICATION OF QUESTION OF HAWAI['']I LAW BY FEDERAL COURTS. (a) When certified.* When a federal district or appellate court certifies to the Hawai['']i Supreme Court that there is involved in any proceeding before it a question concerning the

law of Hawai['']i which is determinative of the cause, and that there is no clear controlling precedent in the Hawai['']i judicial decisions, the Hawai['']i Supreme Court may answer the certified question by written opinion.

2. Ordinance 91–95 has been codified as Honolulu, Haw., Rev.Ordinances ch. 38 (Apr. 1992 Rev.).

3. Honolulu, Haw., Rev.Ordinances § 38–1.2 (Apr. 1992 Rev.) defines "condominium" to mean

    a residential apartment, together with an appurtenant undivided interest in common elements, located on land subject to a declaration

velopments,[4] and planned unit developments [5] and the transfer of such fee simple interests to the lessees. *See* Honolulu, Haw., Rev.Ordinances §§ 38–1.3 (applicability), 38–1.7 (administration of chapter), 38–1.8 (department powers and duties), 38–1.9 (quitclaim deeds), and articles 2 (condemnation of condominium development leaseholds), 3 (condemnation of cooperative housing development leaseholds), 4 (condemnation of resi- dential planned development leaseholds), and 5 (eminent domain) (Apr. 1992 Rev.). Ordinance 91–96 [6] imposes a ceiling on renegotiated lease rents for ground leases of owner-occupied residential "apartments" [7] in the City and County of Honolulu. *See* Honolulu, Haw., Rev.Ordinances §§ 39–1.5 (maximum annual renegotiated lease rent), 39–1.6 (biennial adjustment of renegotiated lease rent), and 39–1.7 (administrative adjustment of an-

of condominium property regime as defined in HRS [ch.] 514A, together with an appurtenant undivided interest in common elements, both used or occupied, or developed, devoted, intended, or permitted to be used or occupied as a principal place of residence for a single family.

HRS ch. 514A (1985 and Supp.1992) sets forth the prerequisites for a condominium property regime.

4. Honolulu, Haw., Rev.Ordinances § 38–1.2 defines "cooperative housing corporation" to mean "a corporation which satisfies the requirements of HRS [§] 519–3(d)(1), or of HRS [ch.] 421H, and the requirements of Section 216 of the Internal Revenue Code of 1986, as amended."

HRS § 519–3(d)(1) (1985) defines "cooperative housing corporation" to mean a corporation

(A) Having one and only one class of stock outstanding;

(B) Each of the stockholders of which is entitled solely by reason of the shareholder's ownership of stock in the corporation, to occupy for dwelling purposes the dwelling unit in a building, owned or leased by the corporation, and situated on land leased by the corporation;

(C) No stockholder of which is entitled (either conditionally or unconditionally) to receive any distribution not out of earnings and profits of the corporation except in a complete or partial liquidation of the corporation; and

(D) Eighty per cent or more of the gross income for the taxable year in which the taxes and interest described in 26 U.S.C. [§] 216(a) are paid or incurred is derived from tenant stockholders. ·

HRS ch. 421H (Supp.1992) regulates the creation and operation of "limited-equity housing cooperatives." HRS § 421H–1 (Supp.1992) defines "limited-equity housing cooperative" in relevant part to mean

a stock cooperative corporation which is organized as a nonprofit corporation ... for the purpose of holding title to, either in fee simple or for a term of years, improved real property, if all or substantially all of the shareholders of such corporation receive a right of exclusive occupancy in a portion of the real property, title to which is held by the corporation, which right of occupancy is transferable only concurrently with the transfer of the share or shares of stock in the corporation held by the person having such right of occupancy....

5. Honolulu, Haw., Rev.Ordinances § 38–1.2 defines "planned development" to mean "a housing development project, also known as a cluster housing development or planned unit development, where the apartment owner holds a leasehold interest in the lot under his or her unit, and *provided that this interpretation excludes any planned unit development covered by HRS [c]hapter 516.*" (Emphasis added). In light of the preemption analysis that follows, the Honolulu City Council's deliberate excision of any possible overlap between the coverage of HRS ch. 516 (1985 and Supp.1992) and Ordinance 91–95 with respect to "planned developments" is particularly significant.

6. Ordinance 91–96 has been codified as Honolulu, Haw., Rev.Ordinances ch. 39 (Apr. 1992 Rev.).

7. Honolulu, Haw., Rev.Ordinances § 39–1.1 (Apr. 1992 Rev.) provides in relevant part that "'[a]partment' ... mean[s] the same as defined under HRS [ch.] 514A."

HRS § 514A–3 (1985) defines "apartment" to mean

a part of the property intended for any type of use or uses, and with an exit to a public street or highway or to a common element or elements leading to a public street or highway, and may include such appurtenances as garage and other parking space, storage room, balcony, terrace, and patio.

The same section defines "property" in relevant part to mean and include

the land, ... whether leasehold or in fee simple, to the extent of the interest held therein by the owner or lessee submitting such interest to the condominium property regime, the building or buildings, all improvements and all structures thereon, and all easements, rights, and appurtenances belonging thereto, ... which have been or are intended to be submitted to the regime....

HRS § 514A–3 (1985 and Supp.1992).

nual renegotiated lease rent to exceed maximum) (Apr. 1992 Rev.).

In response to the enactment of these two ordinances, the Trustees, on December 18, 1991, filed a complaint (No. 91–00725 DAE) against the City in the United States District Court for the District of Hawai'i (the federal court), challenging the validity of Ordinances 91–95 and 91–96. The Coalition, a group representing the interests of lessees, was granted leave to intervene as a defendant on April 1, 1992.

The Trustees' complaint advances thirteen claims for relief. Count XIII, at issue in the instant case, alleges, *inter alia,* that: (1) Ordinance 91–95 is preempted by HRS chs. 101 (eminent domain), 516 (residential leaseholds), 516D (residential leasehold condominiums and cooperatives), 519 (real property leases), 514A (condominium property regimes), and 421H (limited-equity housing cooperatives); and (2) the City lacked the authority to enact Ordinance 91–95 because (a) the ordinance conflicts with these statutes and the Hawai'i Constitution, and (b) the state has not delegated such authority to the City.

On February 14, 1992, the Trustees filed a motion for partial summary judgment as to Counts I through IV, VI, VII, XII, and XIII. On June 8, 1992, the Coalition filed a motion for summary judgment as to the remaining counts of the complaint. On June 9, 1992, the City filed a cross motion for summary judgment on all counts.[8]

On September 16, 1992, the federal court entered an order resolving the claims for relief contained in Counts I through XII of the Trustees' complaint. 802 F.Supp. 326. Specifically, the federal court's order granted the Trustees' motion for partial summary judgment with respect to all counts relating to Ordinance 91–96 and declared the ordinance unconstitutional. However, the federal court found Ordinance 91–95 "to be in compliance with the relevant provisions and

standards of the United States Constitution and the Constitution of the State of Hawai['i]" and, accordingly, granted partial summary judgment in favor of the City and the Coalition and against the Trustees on the Trustees' constitutional claims.

Although it upheld the constitutionality of Ordinance 91–95, the federal court's order did not resolve Count XIII of the Trustees' complaint. Rather, "[u]pon careful review of the relevant state law and the underlying . . . policy implications involved," the federal court found "that the purely state law preemption issue would be best answered in the first instance by the Hawai['i] Supreme Court." Therefore, the federal court certified the question to this court pursuant to HRAP 13. On October 26, 1992, we entered an order determining the question to be "amenable to answer" and establishing an appropriate briefing schedule for the parties.

## II.  *CERTIFIED QUESTION*

According to Hawai'i state law, is Ordinance 91–95 preempted by HRS chs. 46, 101, 516, 516D, 519, 514A, or 421H, as interpreted in conjunction with the Hawai'i Constitution?

## III.  *DISCUSSION*

### A.  *The City Possesses The Authority To Enact Ordinance 91–95.*

The Trustees devote considerable energy to the contention that "[t]he state legislature never delegated to the City the authority necessary for it to enact an involuntary fee conversion ordinance." Trustees' opening brief at 10–15. The City's statutory *authority* to enact Ordinance 91–95 is not expressly placed in issue by the federal court's certified question. Nevertheless, we choose to resolve the issue inasmuch as the federal court indicated unambiguously, in the course of settling the precise language of the certified question, that it intended

> the question [to] be as broad as is appropriate because [it did not] want the Su-

---

8.  The certified question before this court relates only to Count XIII of the Trustees' complaint. Accordingly, Counts I through XII, which set

forth various federal and state constitutional claims, are not directly material to the present matter.

**54**

preme Court to decide the issue, have the matter then go to the Ninth Circuit Court of Appeals, have someone make the argument that ... there [is] still [another] issue, send it back down to [the federal court] ... because it hasn't been decided, ... and [the parties] are right back at square one again.

Oct. 15, 1992 Tr. at 10–11.

1. *HRS §§ 46–61, 46–62, and 101–2 neither limit the counties' general power of eminent domain nor divest them of the authority to enact ordinances allowing for the condemnation of land for any particular public purpose.*

The City maintains that it has the authority to enact Ordinance 91–95 pursuant to HRS § 46–1.5(6) (Supp.1992), which confers upon the City the power of condemnation by eminent domain when it is in the public

9. HRS § 46–1.5 (Supp.1992) provides in relevant part:

*General powers and limitation of the counties.* Subject to general law, each county shall have the following powers and shall be subject to the following liabilities and limitations:

. . . .

(6) Each county shall have the power to exercise the power of condemnation by eminent domain when it is in the public interest to do so.

10. HRS § 46–61 (1985) provides in relevant part:

Each county shall have *the following specific powers:* To take private property for the purpose of establishing, laying out, extending and widening streets, avenues, boulevards, alleys, and other public highways and roads; for pumping stations, waterworks, reservoirs, wells, jails, police and fire stations, city halls, office and other public buildings, cemeteries, parks, playgrounds and public squares, public off-street parking facilities and accommodations, land from which to obtain earth, gravel, stones, and other material for the construction of roads and other public works and for rights-of-way for drains, sewers, pipe lines, aqueducts, and other conduits for distributing water to the public; for flood control; for reclamation of swamp lands; *and other public uses within the purview of section 101–2* [.]
(Emphasis added.)

11. HRS § 101–2 (1985) provides in relevant part:

interest to do so.[9] City's answering brief at 2–7. The Trustees, on the other hand, argue that HRS § 46–1.5(6) does not authorize the City to enact Ordinance 91–95 because the City's powers under that statute are limited by HRS § 46–61 (1985),[10] which only permits the counties to take private property for public purposes within the purview of HRS §§ 101–2 (1985),[11] and 46–62 (1985),[12] the latter mandating, *inter alia,* that condemnation proceedings by the counties "shall be taken and had in accordance with [HRS ch.] 101, as the same may be applicable."[13] Trustees' opening brief at 10–14.

■■■ We therefore confront the task of interpreting general statutes that may appear to be in conflict with specific statutes relating to the same subject matter. Three rules of statutory construction are especially germane to the inquiry.[14] First, legislative enactments are presumptively valid and

*Taking private property for public use; disposal of excess property.* Private property may be taken for public use. Private property may ... be taken by the State or any county[.]

12. HRS § 46–62 (1985) provides:

*Eminent domain; proceedings according to chapter 101.* The proceedings to be taken on behalf of the county for the condemnation of property as provided in section 46–61, shall be taken and had in accordance with chapter 101, *as the same may be applicable.*
(Emphasis added.)

13. Much of the Trustees' argument that HRS § 46–62 divests the City of the authority to promulgate Ordinance 91–95 actually concerns the issue of *preemption,* which we address in section III.B.1 below.

14. A cautionary note on the subject of statutory construction is in order. As Judge Posner has demonstrated in excruciating detail, the entire exercise is often illusory and self-serving, albeit necessary or, at the very least, relevant and useful:

Efforts have been underway for centuries ... to establish that meaningful interpretation is possible in every statutory or constitutional case; the efforts have failed and the problem remains. The plain-meaning rule and the other "canons of construction" are the subject of a large and, on the whole, negative literature. The soundest criticism is not that the canons are wrong, although some are.... It is that they are just a list of relevant considerations, at

"should be interpreted [in such a manner as] to give them effect." *State v. Spencer*, 68 Haw. 622, 624, 725 P.2d 799, 800 (1986) (citation omitted). Second, "[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another." HRS § 1–16 (1985); *Kam v. Noh*, 70 Haw. 321, 325, 770 P.2d 414, 417 (1989). Third, "where there is a 'plainly irreconcilable' conflict between a general and a specific statute concerning the same subject matter, the specific will be favored. However, where the statutes simply overlap in their application, effect will be given to both if possible, as repeal by implication is disfavored." *Mahiai v. Suwa*, 69 Haw. 349, 356–57, 742 P.2d 359, 366 (1987) (citations omitted).

■ Unquestionably, HRS §§ 46–1.5(6), 46–61, 46–62, and 101–2 are *in pari materia*, inasmuch as they all relate generically to the subject matter of the counties' power of condemnation by eminent domain. However, close examination reveals that they are complementary rather than conflicting. *Cf. Mahiai*, 69 Haw. at 356–57, 742 P.2d at 366.

HRS § 46–1.5(6) is a "general" statute; it establishes the counties' broad power of condemnation "in the public interest." HRS § 46–61, the more specific statute, designates, but does not limit, the purposes for which a county may exercise its power of eminent domain, insofar as it subsumes with-

in its broad scope the taking of private property for "public uses within the purview of [HRS §] 101–2." And, in the main, HRS § 101–2 merely reiterates both the state and counties' power to take private property "for public use." By the same token, HRS § 46–62, which governs the manner by which the counties' power to condemn will be *effected*, simply incorporates the procedures prescribed by HRS ch. 101, "as the same may be applicable." (Whether HRS ch. 101 preempts Ordinance 91–95 is considered in section III.B.1 below.)

Thus, by construing the statutes *in pari materia*, we distill the following general scheme: (1) HRS §§ 46–1.5(6) and 101–2 confer upon the counties the general power of eminent domain for public purposes; (2) HRS § 46–61 delineates the public *uses* for which the counties may condemn land and includes any unenumerated "other public uses" consonant with HRS § 101–2; and (3) HRS § 46–62 clarifies the *procedures* to be followed by the counties in exercising the power.

We note that it is with our construction of the foregoing statutory scheme, and with that construction alone, that the dissenting opinion (dissent) takes issue.[15] First, the dissent acknowledges that " '[o]n superficial examination' it might appear that [HRS § 46–1.5(6)] grants broad powers of eminent domain to the counties, limited only by the requirement that the powers be exercised 'in

best of modest utility. They are things to bear in mind; don't invalidate a statute if a saving construction is possible, don't lightly assume that by passing a new statute the legislature inadvertently repealed a previous one, don't ignore surrounding provisions, don't (the valid core of the plain meaning rule) be too quick to override the apparent meaning, and so on. There are a vast number of canons, corresponding to the vast number of considerations that come into play (often unconsciously) when one is reading. Cautionary rather than directive, often pulling in opposite directions like their counterparts, the maxims of ordinary life ..., the canons are the collective folk wisdom of statutory interpretation and they no more enable difficult questions of interpretation to be answered than the maxims of everyday life

enable the difficult problems of everyday living to be solved.

Many of the canons are not interpretive at all, in the sense of helping a court figure out what the legislature meant. Instead they establish presumptions, based on substantive policy, for resolving indeterminate statutory cases.... Substantive political principles used to decide cases when interpretation fails, they are an acknowledgment of the impossibility of resolving all statutory questions interpretively.

R.A. Posner, *The Problems of Jurisprudence* 279–80 (1990) (footnotes omitted).

15. The dissenting opinion agrees with us that HRS § 46–62 "simply incorporates the *procedures* prescribed by HRS ch. 101." Dissent at 1216 n. 3 (emphasis in original).

the public interest.'" Dissent at 1216. The dissent argues, however, that upon "[c]loser examination of the statute, application of principles of statutory construction, and a review of the legislative history, ... all demonstrate that the power of eminent domain referred to in HRS § 46–1.5(6) is limited by the provisions of HRS § 46–61." *Id.*

Second, the dissent concedes that "[b]ecause HRS § 101–2 places no limits on the public uses for which the power of eminent domain may be exercised, under a literal reading of HRS § 46–61, the several counties would have the authority to exercise the power of eminent domain for *any* constitutionally valid public use." *Id.* at 1218 (emphasis in original and footnote omitted). Notwithstanding the admittedly limitless scope of HRS § 101–2, however, the dissent dismisses a "literal reading" of HRS § 46–61 on the basis that it would render "the enumerated list of specific uses preceding the 'other public uses' clause" therein, *see supra* note 10, "entirely unnecessary." *Id.* at 1218. Because, in the dissent's view, "the counties do not have the virtually unlimited authority to condemn property that a literal reading would indicate, but are limited to purposes that are within the scope of their governmental powers," the dissent concludes that "HRS § 46–61 is ambiguous," thus necessitating resort to "extrinsic aids to statutory construction, in particular the legislative history, ... in order to ascertain the legislature's intent." *Id.* Having engaged in its analysis of that history, the dissent concludes that "it is abundantly clear that the legislature did not intend to authorize the several counties to exercise the power of eminent domain for any and all unenumerated constitutionally valid public uses." *Id.* at 1221.

Third, based on the history of various legislation subsequent to the inclusion, in 1951, of the "other public uses" clause in HRS § 46–61, *id.* at 1220–21, 1222, the dissent concludes that HRS § 46–61 "should be interpreted as simply making clear that the several counties can exercise the power of eminent domain for public uses not on the enumerated list of HRS § 46–61 when autho-

rized to do so by other statutes." *Id.* at 1222.

We are unpersuaded by the dissent's arguments.

Reduced to its essence, the dissent's position is that the declarations of HRS §§ 46–1.5(6) (*i.e.,* that "[e]ach county shall have the power to exercise the power of condemnation by eminent domain when it is in the public interest to do so"), 101–2 (*i.e.,* that "[p]rivate property may be taken for public use ... by the State or *any county*" (emphasis added)), and 46–61 (*i.e.,* that "[e]ach county shall have the ... specific power[ ] [t]o take private property for ... public uses within the purview of [HRS §] 101–2") do not mean exactly what they say. However, " '[t]he fundamental starting point for statutory interpretation is the language of the statute itself. ... [W]here the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning.' " *AIG Hawai'i Ins. Co. v. Estate of Caraang,* 74 Haw. 620, 633–34, 851 P.2d 321, 328 (1993) (quoting *National Union Fire Ins. Co. v. Ferreira,* 71 Haw. 341, 344, 790 P.2d 910, 912 (1990)). The dissent acknowledges "the plain language rule of statutory construction," but seeks to avoid it on the basis that a literal construction of HRS §§ 46–1.5(6), 101–2, and 46–61 "would produce an absurd or unjust result, inconsistent with the policies of the statute[s]." Dissent at 1215–16. We submit, for the reasons stated in this opinion, that construing the plain language of these three statutes to authorize the City to enact Ordinance 91–95 is neither absurd nor unjust. If we are correct, then the entire theoretical underpinning of the dissent's resort to *any* "extrinsic aids to statutory construction" is toppled.

Citing 2A *Sutherland Statutory Construction* § 47.23 at 216–17 (5th ed. 1992) for the proposition that "when the legislature expresses things through a list, the court assumes that what is not listed is excluded," the dissent concludes that "the enumeration of specific uses in HRS § 46–61 [thus] limits the apparent grant of general powers in HRS

§ 46–1.5(6)." Dissent at 1216–17. The principle of *expressio unius est exclusio alterius* is inapplicable to HRS § 46–61, however, precisely because the "other public uses within the purview of [HRS §] 101–2" clause is an element of the statute's "list." Therefore, in our view, the dissent's conclusion begs the question.

In any event, we believe that the dissent's own reliance on the legislative history of HRS §§ 101–2 and 46–61 ultimately belies its position. The dissent acknowledges that Act 12, §§ 1(b) and 5(a), 1951 Haw.Sess.Laws 52–53, 61 (Act 12) simultaneously amended the predecessors of HRS §§ 101–2 and 46–61, respectively. Dissent at 1219. Section 1(b) of Act 12 amended the predecessor to HRS § 101–2 by replacing an "enumerated list of public uses and replacing it with the simple provision that '[p]rivate property may be taken for public use.'" *Id.* Section 6 of Act 12 clarified that "[HRS § 101–2] . . . shall be deemed to include all public purposes specifically mentioned therein before such amendment and *any other additional public purposes.*" *Id.* at 1219 n. 14 (emphasis added). Moreover, Sen.Stand.Comm.Rep. No. 177, in 1951 Senate Journal, at 541, stated in relevant part that the amendment to "[HRS § 101–2] provides generally that the power of eminent domain may be exercised *for any public use instead of, as at present, attempting to define minutely each public use or purpose.*" *Id.* at 1218 n. 7 (emphasis added).

The dissent correctly suggests that this legislative history "reinforces the conclusion that HRS § 101–2 places no statutory limitation on the uses for which the *state* can exercise its power of eminent domain." *Id.* at 1219 (emphasis added). What the dissent ignores is that section 1(b) of Act 12 conferred the power of eminent domain *equally* upon the Territory of Hawai'i and the respective counties. It therefore follows that sections 1(b) and 6 of Act 12 manifested an express legislative intention that the *counties,* as well as the territory (now state), have

the power to take private property "for any public use" (emphasis added). That being the case, the legislature behaved in a completely consistent fashion when it enacted section 5(a) of Act 12, inserting the "other public uses within the purview of [HRS § 101–2]" clause into the predecessor of HRS § 46–61. We believe that the reasons, if any, why the legislature retained "the enumerated list in HRS § 46–61" are ultimately unknowable, and the dissent's explanation of the legislature's treatment of the "list," both before and after the promulgation of Act 12, is pure speculation. *See* dissent at 1219, 1222.

> Courts cannot amend statutes in the guise of interpreting them, and they must presume that [the legislature] meant what it said. . . . Only "unmistakable support in the history and structure of the legislation," *Blue Chips Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring), can justify a rejection of otherwise unambiguous language. Such "unmistakable support" for [the dissent's] construction is absent here.

*Standard Oil Co. of California v. Agsalud,* 442 F.Supp. 695, 703 (1977), *aff'd and reh'g denied,* 633 F.2d 760 (9th Cir.1980).

Accordingly, we hold that HRS §§ 46–61, 46–62, and 101–2 neither limit the counties' (and therefore the City's) general power of eminent domain, as set out in HRS 46–1.5(6), nor divest them of the authority to enact ordinances allowing for the condemnation of land for any particular public purpose.

### 2. The City did not impermissibly delegate its power of eminent domain.

The Trustees next urge that "[t]he City lacks the authority to redelegate its eminent domain powers as attempted in Ordinance 91–95," Trustees' opening brief at 14, because sections 2.2 (relating to condemnation of condominium development leaseholds),[16]

---

16. Honolulu, Haw., Rev.Ordinances § 38–2.2 (Apr. 1992 Rev.), provides in relevant part:

3.2 (relating to condemnation of cooperative housing development leaseholds),[17] and 4.2 (relating to condemnation of residential planned development leaseholds) [18] of the ordinance impermissibly transfer the City's limited condemnation power from the "governing authority," *i.e.*, the city council, prescribed by HRS § 101–13 (1985),[19] to the City's Department of Housing and Community Development (the Department). *Id.* at 14–15. We disagree.

■ The Trustees appear to have misread Honolulu, Haw., Rev. Ordinances §§ 38–2.2, 38–3.2, and 38–4.2 (Apr. 1992 Rev.). Although the Department is empowered to *designate* land for acquisition pursuant to these sections, by their very terms the Department

(a) Subject to subsection (b) of this section, the [D]epartment [of Housing and Community Development] may *designate* all or that portion of a development containing residential condominium land for acquisition, and *facilitate* the acquisition of the applicable leased fee interests in that land by the [C]ity through the exercise of the power of eminent domain or by purchase under the threat of eminent domain[.]
(b) This land *designated* and acquired by the [C]ity may consist of a portion of or the entirety of the land area submitted to the declaration of condominium property.
(Emphasis added.)

**17.** Honolulu, Haw., Rev.Ordinances § 38–3.2 (Apr. 1992 Rev.) provides in relevant part:
(a) Subject to subsection (b) of this section, the [D]epartment may *designate* all of a development for acquisition, and *facilitate* the acquisition of the leased fee interests in the development by the [C]ity through the exercise of the power of eminent domain or by purchase under the threat of eminent domain[.]
(b) The development *designated* and acquired by the [C]ity shall consist of the entire land parcel leased to a cooperative housing corporation.
(c) Where the cooperative housing development consists of both residential and non-residential units, the terms "development," "cooperatives," or similar terms when used in this article, including the provisions on acquisition . . . , shall be construed to apply only to the residential units.
(Emphasis added.)

**18.** Honolulu, Haw., Rev.Ordinances § 38–4.2 (Apr. 1992· Rev.) provides in relevant part:
(a) Subject to subsection (b) of this section, the [D]epartment may *designate* all or a por-

merely *facilitates* the City's acquisition of the land subject to the decision of the City, through its City Council, actually to *exercise* the power of eminent domain as prescribed by HRS §§ 101–13 and 101–14.[20] In other words, the sections accord the Department the authority to *assist* the City's statutorily designated "governing authority" in the ultimate exercise of that power; they do not, and cannot, confer the power to condemn land on the Department itself.

Because the Department's mere designation of land, as a means of facilitating its acquisition by the City, is only a preliminary step in the condemnation process that precedes the institution of eminent domain proceedings at the behest of the City Council,

tion of the land beneath a planned development containing residential units for acquisition, and *facilitate* the acquisition of the applicable leased fee interests in such land by the [C]ity through exercise of the power of eminent domain or by purchase under the threat of eminent domain[.]
(b) The land *designated* and acquired by the [C]ity may consist of a portion of or the entire land area submitted to the declaration of planned development.
(Emphasis added.)

**19.** HRS § 101–13 (1985) provides in relevant part:

*Exercise of power by county.* Whenever any county deems it advisable or necessary to exercise the right of eminent domain in 'the furtherance of any governmental power, the proceedings may be instituted as provided in section 101–14 after the governing authority (county council, or other governing board in the case of an independent board having control of its own funds) of the county has authorized such suit by resolution duly passed, or adopted and approved, as the case may be. . . .
HRS § 101–14 (1985) provides in relevant part:
*Plaintiff.* . . . Any county may institute proceedings in the name and on behalf of the county for the condemnation of property within the county for any of the purposes provided in this part which are within the powers granted to the county.
*None of the parties to the present dispute have* taken the position that the City's Department of Housing and Community Development controls the funds to effect the condemnation of land.

**20.** *See supra* note 19.

we hold that Ordinance 91–95 does not entail the sort of impermissible delegation of the power of eminent domain from the City Council to the Department that would violate HRS § 101–13.

B. *Ordinance 91–95 Is Not Preempted By HRS Chs. 46, 101, 516, 516D, 519, 514A, Or 421H, As Interpreted In Conjunction With The Hawai'i Constitution.*

We now turn directly to the question certified by the federal court. Relying on two distinct theories, the Trustees allege that Ordinance 91–95 is preempted by HRS chs. 46 (1985 and Supp.1992) (general provisions common to all counties), 101 (1985 and Supp.1992) (eminent domain), 516 (1985 and Supp.1992) (residential leaseholds), 516D (Supp.1992) (residential leasehold condominiums and cooperatives), 519 (1985 and Supp.1992) (real property leases), 514A (1985 and Supp.1992) (condominium property regimes), and 421H (Supp.1992) (limited-equity housing cooperatives). Trustees' opening brief at 16–34. The first theory is that the legislature intended the respective chapters "to be exclusive and uniform in the fields of eminent domain procedures, involuntary fee conversion, and residential leasehold condominiums and cooperatives." *Id.* at 16–28. The second is that Ordinance 91–95 conflicts with these statutes because they "conflict with it on matters of statewide interest and concern." *Id.* at 29–34.

The Trustees apparently rely on HRS § 46–1.5(13) as the cornerstone of their preemption arguments. In its present form, the statute provides:

*General powers and limitation of the counties.* Subject to general law, each county shall have the following powers and shall be subject to the following liabilities and limitations:

. . . .

(13) Each county shall have the power to enact ordinances deemed necessary to protect health, life, and property, and preserve the order and security of the county and its inhabitants on any subject or matter not inconsistent with, or tending to defeat, the intent of any state statute, provided also that the ordinance does not disclose or express an implied intent that the ordinance shall be exclusive, or uniform throughout the State.

HRS § 46–1.5(13) (Supp.1992). In order to place HRS § 46–1.5(13) in its correct context with regard to the certified question before us, however, it is necessary both to trace its legislative evolution and to understand its significance within the larger statutory framework in which it is situated.

HRS § 46–1.5(13) is the successor to HRS § 70–105, which was first enacted in 1909, amended once in 1939, and provided:

*Effect of state statutes.* No ordinance shall be held invalid on the ground that it covers any subject or matter embraced within any statute of the State; provided that the ordinance is not inconsistent with and does not tend to defeat the intent or object of the statute or of any other statute; provided also that the statute does not disclose an express or implied intent that the same shall be exclusive, or uniform throughout the State.

HRS § 70–105 (1985).

Prior to 1988, HRS ch. 70, entitled "General provisions relating to Honolulu," was subsumed within HRS Title 6, which was, and remains, the comprehensive statutory scheme governing "county organization and administration." Title 6 was organized into three Subtitles. Subtitle 1, entitled "Provisions common to all counties," encompassed HRS chs. 46 through 57. Subtitle 2, entitled "Government of Hawai[']i, Kaua[']i, [and] Maui," encompassed HRS chs. 61 through 67 and addressed matters relating to general organization and power, county officers, and other provisions specific to those three counties. Subtitle 3 was entitled "Honolulu government," related exclusively to the City and County of Honolulu, and consisted solely of

HRS ch. 70.[21]

Effective June 13, 1988, the legislature enacted Act 263, the purpose of which was

to repeal the special or local statutes setting forth the powers of particular counties, and to replace these provisions with grants of general powers which would have uniform operation in all counties of the State ... so that all counties [would] have similar general powers or limitations that supersede currently unnecessary provisions.

Hse.Stand.Comm.Rep. No. 433–88, in 1988 House Journal, at 1006. Put more succinctly, the purpose of the act was "to promote ... uniformity by replacing special and local laws with grants of general powers that apply to all counties." Act 263, § 1, 1988 Haw. Sess.Laws 483. Among other things, Act 263 repealed Subtitles 2 and 3 (and hence HRS ch. 70) of Title 6 and reorganized Subtitle 1. Key to that reorganization was the promulgation of HRS § 46–1.5, which, in effect, enumerated the general powers of the county governments, "subject to general [*i.e.*, state] law." [22]

As formulated by Act 263, HRS § 46–1.5(13) was identical to the present statute, except that the concluding proviso clause read: "provided also that the *statute* does not disclose or express an implied intent that the *statute* shall be exclusive or uniform throughout the State." Act 263, § 2, 1988 Sess.Laws 484 (emphasis added). HRS § 46–1.5(13) remained unaltered until 1991, when, without explanation in any legislative history, it was amended to substitute "ordinance" for "statute" where the latter is highlighted in this paragraph. Act 212, § 2, 1991 Sess.Laws 490.

■ Unfortunately, HRS § 46–1.5(13), in its present incarnation, is an oxymoron. Read literally, it counsels that a county may enact an ordinance so long as the ordinance is not intended to be "exclusive or uniform throughout the [s]tate." Inasmuch as an ordinance is "a *local* law of a *municipal* corporation ... prescribing general, uniform, and permanent rules of conduct relating to the corporate affairs of the *municipality*," *Black's Law Dictionary* 1097 (6th ed. 1990) (emphasis added), it cannot, by definition, evince such an intent.

■ This court has recognized that departure from a literal construction of a statute " 'is justified when such construction would produce an absurd ... result and the literal construction in the particular action is clearly inconsistent with the purposes and policies of the act.' " *Franks v. City and County of Honolulu*, 74 Haw. 328, 341, 843 P.2d 668, 674 (1993) (quoting *Hawaiian Ins. & Guar. Co. v. Financial Sec. Ins. Co.*, 72 Haw. 80, 85, 807 P.2d 1256, 1259 (1991)).

HRS § 46–1.5(13) (Supp.1992) presents just such a case. A literal reading of it would not only produce an absurd result, but would also be clearly inconsistent with its purposes and policies. HRS § 46–1.5(13) was enacted in 1988 because the legislature expressly intended to expand the scope of HRS § 70–105, which was limited to the City and County of Honolulu, to all of the state's counties. But because HRS § 46–1.5(13) emerged from HRS § 70–105 otherwise substantively intact, it is clear that HRS § 46–1.5(13) was intended to be a provision mandating the preemption of any ordinance that either conflicted with the intent of a state statute or legislated in an area already staked out by the legislature for exclusive and statewide statutory treatment.

■ In *Sherwin-Williams Co. v. City of Los Angeles*, 4 Cal. 4th 893, 16 Cal.Rptr.2d 215, 844 P.2d 534 (1993), the California Supreme Court recently synthesized the general principles governing preemption as follows:

If otherwise valid local legislation *conflicts* with state law, it is preempted by such law and is void.

---

**21.** HRS ch. 71, entitled "Artesian well control," was repealed by the legislature in 1975.

**22.** It is noteworthy that the legislature regarded HRS § 46–1.5(6) as "codifying existing county condemnation powers." Hse.Stand.Rep. No. 433–88, in 1988 House Journal, at 1006.

A *conflict* exists if the local legislation *duplicates, contradicts,* or *enters an area fully occupied by general law,* either expressly or by legislative implication.

Local legislation is *"duplicative"* of general law when it is coextensive therewith.

Similarly, local legislation is *"contradictory"* to general law when it is inimical thereto.

Finally, local legislation *enters an area that is "fully occupied" by general law* when the Legislature has expressly manifested its intent to "fully occupy" the area, or when it has impliedly done so....

*Id.* at 897, 16 Cal.Rptr.2d at 217–18, 844 P.2d at 536–37 (citations omitted and emphasis added).[23]

This court has employed a compatible but somewhat different approach to the issue of preemption of county ordinances by state statutory law, which might best be characterized as a "comprehensive statutory scheme" test. In *In re Application of Anamizu,* 52 Haw. 550, 481 P.2d 116 (1971), we considered whether a city ordinance mandating the certification of electrical contractors by a municipal agency was preempted by a state statutory scheme that governed the licensing of *all* building contractors. Applying HRS § 70–105 (the precursor to HRS § 46–1.5(13)), we held that the city ordinance was preempted by the state statutory scheme, noting that "the critical determination to be made" under HRS § 70–105 was whether the statutory scheme at issue "indicate[d] a legislative intention to be the exclusive legislation applicable to contractors." *Anamizu,* 52 Haw. at 553, 481 P.2d at 118. Because the legislation "established a comprehensive statutory scheme for regulating the contracting business within the [s]tate," we ruled that the state's grant of permission to a contractor "to pursue his occupation throughout the [s]tate" could "not be circumscribed by local authorities through the enactment of *additional* qualifying regulations." *Id.* at 554–55,

481 P.2d at 118–19 (emphasis added). "To hold otherwise," we said, "would be to allow the intercity flow of contracting services to be impaired, thereby severely diluting the value of a uniform state licensing system." *Id.* at 555, 481 P.2d at 119.

*Anamizu* is distinguishable from the present case on at least two grounds. First, the state statute in question created a global (*i.e.,* "comprehensive") mechanism for regulating the licensing of the entire universe of building contractors within the state; by contrast, the city ordinance undertook to regulate only electrical contractors—a discrete galaxy within, or a subset of, that universe. In the matter before us, the applicable state laws and Ordinance 91–95 establish the right of lease-to-fee conversion with respect to entirely distinct galaxies—residential houselot leasehold interests in the case of state law, *see* HRS §§ 516–1 (Supp.1992) and 516–2 (1985), and condominium, cooperative, and planned development leasehold interests in the case of Ordinance 91–95. Second, the city ordinance at issue in *Anamizu* imposed "qualifying regulations" upon electrical contractors for municipal certification that were "additional" to those required for state licensure. In the present case, because Ordinance 91–95 leaves the particular subject matter of residential houselot leasehold interests untouched, it necessarily follows that the ordinance imposes nothing that is "additional" to the applicable state law addressing that subject matter. Thus, while the substantive legal principles articulated in *Anamizu* govern the question before us, the particular facts of the case are inapposite.

Likewise, in *Citizens Utilities Co. v. County of Kauai,* 72 Haw. 285, 814 P.2d 398 (1991), we held that a county ordinance regulating the height of utility poles was preempted by the combination of HRS § 269–6 (1985), which conferred upon the State Public Utilities Commission (PUC) the power of "general supervision ... over all public utilities," and a specific regulation of the PUC that governed, *inter alia,* the minimum requirements for utility pole height.

---

**23.** The *Sherwin–Williams* formulation for determining whether an ordinance is preempted by state law is particularly relevant to the Trustees' "conflict" theory, which we analyze in section III.B.2 below.

*Id.* at 288–89, 814 P.2d at 400. In doing so, we applied the *Anamizu* test to HRS § 46–1.5(13) (the successor to HRS § 70–105) and declared that "a municipal ordinance, which covers the same subject matter embraced within a [s]tate statute is invalid if the statute discloses an express or implied intent that the same shall be exclusive, or uniform in application throughout the [s]tate." *Id.* at 289, 814 P.2d at 400.[24]

Analogously to *Anamizu*, but unlike the present matter, the state law at issue in *Citizens Utilities* governed a substantive "universe," *i.e.*, global regulation of public utilities, whereas the relevant county ordinance addressed only a "galaxy" thereof—utility pole regulation. Accordingly, while the principle of preemption law reaffirmed in *Citizens Utilities* governs the question before us, the facts of the case are similarly inapposite.

■ In summary, a municipal ordinance may be preempted pursuant to HRS § 46–1.5(13) if (1) it covers the same subject matter embraced within a comprehensive state statutory scheme disclosing an express or implied intent to be exclusive and uniform throughout the state or (2) it conflicts with state law.

1. *Ordinance 91–95 does not cover the same subject matter embraced within a comprehensive state statutory scheme disclosing an express or implied intent to be exclusive and uniform throughout the state.*

   a. *HRS chs. 46 and 101*

■ The Trustees argue that HRS §§ 46–61, 46–62, and ch. 101 "set forth a comprehensive and uniform eminent domain scheme (Chapter 101) that preempts all locally enacted condemnation procedures." Trustees' opening brief at 18. The Trustees' argument, however, is logically flawed.

As we have noted, HRS § 101–2 confers upon both the state and the counties the general power to take private property for public purposes. More globally, HRS ch. 101 is a *procedural* statute; it prescribes the mechanical steps that the state and counties must follow in the actual *commencement and prosecution* of takings for such purposes. HRS §§ 46–61 and 46–62 are merely complementary to HRS ch. 101. HRS § 46–61 reiterates the counties' power "to take private property for . . . public uses within the purview of [HRS §] 101–2." And HRS § 46–62 incorporates the procedures prescribed by HRS ch. 101, "as the same may be applicable." Thus, the statutory scheme circumscribed by HRS §§ 46–61 and 46–62 and ch. 101 is "uniform" but not "comprehensive" because, although it controls the mechanics of the taking *process*, it neither expressly nor impliedly addresses (1) the *preliminary* subject of the rights of lessees to lease-to-fee conversion via the mechanism of the counties' (and therefore the City's) power of condemnation or (2) the *subsequent* subject of the manner by which lessees might acquire the fee interest in their land from the City before, during, or after the City has accomplished the takings.

It is precisely these two subjects that are subsumed within Ordinance 91–95. In the first instance, the ordinance

---

**24.** *Citizens Utilities* implicitly acknowledged the "conflict" approach to preemption, later enunciated in *Sherwin–Williams*, when we stated that

> [i]t is clear that the legislature intended to reserve with the PUC the regulatory powers over public utilities, which was a matter of statewide concern to the legislature, and has preempted the power of the counties to regulate the height of utility poles. To allow the County to do so would be inconsistent with the intent of the statutory language expressly authorizing the PUC to supervise and regulate public utilities, which would include the height of utility poles.

*Citizens Utilities*, 72 Haw. at 288, 814 P.2d at 400. To paraphrase, we held, in effect, that the county ordinance had entered an area that was "fully occupied" by general state law. *See Sherwin–Williams*, 4 Cal. 4th at 897, 16 Cal.Rptr.2d at 217–18, 844 P.2d at 536–37.

Moreover, although not strictly speaking a preemption case, *Waikiki Resort Hotel, Inc. v. City and County of Honolulu*, 63 Haw. 222, 624 P.2d 1353 (1981), is also instructive. In the context of the proposition that "[a] municipal ordinance, which is enacted pursuant to authority contained in a state statute is invalid if it conflicts with the enabling statute," we stated that "[a] test to determine whether an ordinance conflicts with a statute is whether it prohibits what the statute permits or permits what the state prohibits." *Id.* at 241, 624 P.2d at 1366 (citations omitted).

establish[es] the right of any person, who is a lessee under any long-term lease of land upon which is situated either residential condominium property regime projects ..., cooperative housing unit projects[,] or residential planned development projects, to purchase at a fair and reasonable price the fee simple title to such land.

Honolulu, Haw., Rev.Ordinances § 38–1.1 (Apr. 1992 Rev.). In the second instance, the ordinance governs, *inter alia:* (1) the *designation* of the leased fee interests to be taken; Honolulu, Haw., Rev.Ordinances §§ 38–2.2, 38–3.2, and 38–4.2; (2) the *qualifications* of lessees for purchase; Honolulu, Haw., Rev.Ordinances §§ 38–2.4, 38–3.4, and 38–4.4 (Apr. 1992 Rev.); (3) the actual *purchases* by lessees; Honolulu, Haw., Rev.Ordinances §§ 38–2.3, 38–3.3, 38–4.3 (Apr. 1992 Rev.); and (4) the *preliminary negotiations* with lessors required of lessees; Honolulu, Haw., Rev.Ordinances §§ 38–2.6, 38–3.6, and 38–4.6 (Apr. 1992 Rev.). These provisions have no counterparts in HRS §§ 46–61, 46–62, or ch. 101.

Accordingly, it cannot be said that Ordinance 91–95 "covers the same subject matter embraced within" HRS §§ 46–61, 46–62, and ch. 101. *See Citizens Utilities,* 72 Haw. at 289, 814 P.2d at 400. That being the case, the state statutory scheme encompassed therein does not, and indeed cannot, "indicate a legislative intention to be the exclusive legislation applicable to" the domain of the ordinances—the rights of certain otherwise statutorily uncovered classes of residential lessees to involuntary lease-to-fee conversion. *See Anamizu,* 52 Haw. at 553, 481 P.2d at 118.

### b. *HRS ch. 516*

The Trustees next urge that HRS ch. 516, popularly known as the Land Reform Act, preempts Ordinance 91–95 because it "sets forth an exclusive and comprehensive state statutory scheme covering involuntary fee conversion." Trustees' opening brief at 18. The Trustees' position in this regard, however, is defeated by the plain and self-limiting language of the very statute on which they rely.

■ "The interpretation of a statute is a question of law reviewable *de novo.* When construing a statute, our foremost obligation 'is to ascertain and give effect to the intention of the legislature[,]' which 'is to be obtained primarily from the language contained in the statute itself.'" *Franks v. City and County of Honolulu,* 74 Haw. at 334, 843 P.2d at 671 (quoting *In re Hawaiian Telephone Co.,* 61 Haw. 572, 577, 608 P.2d 383, 387 (1980)) (other citation omitted); *Kaapu v. Aloha Tower Dev. Corp.,* 74 Haw. 365, 387, 846 P.2d 882, 891 (1993). In other words, "[t]he fundamental starting point for statutory interpretation is the language of the statute itself.... And where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning.'" *Estate of Caraang,* 74 Haw. at 633–34, 851 P.2d at 328.

■ HRS § 516–2, delineating the "applicability" of the Land Reform Act, provides in relevant part:

This chapter applies to all *lands leased as residential lots* which are owned or held privately or owned by the State or its political subdivisions, except Hawaiian home lands which are subject to Article XII of the Constitution of the State and lands owned or held by the federal government. *This chapter is not meant to supersede or preclude any other remedy at law available to residential leasehold lessees* or the State....

(Emphasis added.) HRS § 516–1 defines "residential lot" (which the section deems to be synonymous with "lot," "houselot," and "residential houselot") to mean "a parcel of land, two acres or less in size, which is used or occupied or is developed, devoted, intended, or permitted to be used or occupied as a *principal place of residence for one or two families.*" (Emphasis added.)

Thus, by its own plain and unambiguous language, the subject matter of HRS ch. 516 is limited to the involuntary lease-to-fee con-

version of "lots" of land that are two acres or less in size and are used or intended for use as the principal residences for one or two families. As such, HRS ch. 516 does not "cover the same subject matter embraced within" Ordinance 91–95 and, for that reason alone, the statute must therefore fail the *Citizens Utilities* preemption test. *See Citizens Utilities*, 72 Haw. at 289, 814 P.2d at 400.

Moreover, the fact that HRS ch. 516 was expressly "not meant to *supersede or preclude* any other remedy at law available to *residential leasehold lessees,*" *see* HRS § 516–2 (emphasis added), demonstrates for two reasons that the legislature could not possibly have intended the Land Reform Act to be the exclusive legislation applicable to the involuntary lease-to-fee conversion of *all* residential leaseholds. First, the lessees eligible for the benefits of Ordinance 91–95 (*i.e.,* leaseholders of residential condominium units, residential cooperative units, and residential planned development units) are as much "residential leasehold lessees" as those eligible for the benefits of HRS ch. 516 (*i.e.,* residential lot leaseholders); yet the legislature expressly preserved the possibility of legal remedies, *extrinsic* to HRS ch. 516, for both. The substantive provisions of Ordinance 91–95 obviously encompass a "remedy at law" within the meaning of HRS § 516–2. Second, and correlatively, the legislature's express declaration that HRS ch. 516 was not "meant" (*i.e.,* intended) to "supersede or preclude" any such legal remedy is antithetical to any intent that the statutory scheme created by the Land Reform Act be "the exclusive legislation applicable."[25] As such, HRS ch. 516 fails the *Anamizu* preemption test as well. *See Anamizu,* 52 Haw. at 553, 481 P.2d at 118.

In short, HRS ch. 516 does not, as the Trustees urge, set forth an exclusive and comprehensive state statutory scheme covering involuntary lease-to-fee conversion and, accordingly, cannot preempt Ordinance 91–95 on that basis.

### c. *HRS chs. 516D, 519, 514A, and 421H*

Finally, the Trustees contend that HRS chs. 516D, 519, 514A, and 421H preempt Ordinance 91–95 because the ordinance interferes with and intrudes upon the comprehensive statewide statutory scheme established by each chapter. Trustees' opening brief at 24–28. We disagree.

HRS ch. 516D, although covering condominium property regimes and cooperative housing corporations, in no way addresses the subject matter of involuntary lease-to-fee conversions. Instead, it prescribes disclosure requirements and provisions for mandatory arbitration of rent renegotiations. Because the subject matter embraced within HRS ch. 516D is not the same as that covered by Ordinance 91–95, the former does not preempt the latter on that basis. *See Anamizu* and *Citizens Utilities, supra.*

Similarly, HRS chs. 519, 514A, and 421H all cover subject matters distinct from that of involuntary lease-to-fee conversion. HRS ch. 519 deals with the *renegotiation* of leases. HRS ch. 514A concerns the *governance and management* of condominiums, the *registration* of condominium projects, the *filing* of public reports, and *disclosure* and other requirements designed to protect condominium purchasers. HRS ch. 421H governs the *formation* of limited-equity housing cooperatives. None of these chapters address the substantive process of involuntary lease-to-fee conversion. Accordingly, applying the *Anamizu* and *Citizens Utilities* tests, no legislative intent to preempt Ordinance 91–95 can be implied.

2. *Ordinance 91–95 does not conflict with state law on the basis that it enters an area fully occupied thereby or that it is duplicative with respect thereto.*

We next address the Trustees' second preemption theory, namely, that "Ordinance 91–

---

25. That the Hawai'i legislature "has a long history of considering, and rejecting, proposed bills that would extend [HRS ch.] 516's provisions to residential leasehold condominiums and cooperatives," Trustees' opening brief at 22, merely begs the question. Indeed, it could reasonably be argued that the legislature's "long history" is itself evidence that it did not intend HRS ch. 516 to be "exclusive."

95 is preempted by state statutes that conflict with it on matters of statewide interest and concern." Trustees' opening brief at 29. The Trustees assert two bases for their position.

First, according to the Trustees, because the ordinance conflicts with HRS chs. 516, 519, 516D, 514A, and 421H, it violates article VIII, section 6 of the Hawai'i Constitution [26] and its implementing statute—HRS § 50-15 (1985).[27] Correlatively, the Trustees argue that Ordinance 91-95 conflicts with article IX, section 5 of the Hawai'i Constitution,[28] which, in conjunction with the chapters just enumerated, establishes that "housing is a matter of statewide concern and interest" such that "the state has exclusive power to legislate in the area." Trustees' opening brief at 31. Second, the Trustees rely on *Fasi v. City and County of Honolulu*, 50 Haw. 277, 439 P.2d 206 (1968),[29] for further authority that Ordinance 91-95 conflicts with HRS chs. 46, 101, 516, 516D, 519, 514A, and 421H because the ordinance "cover[s] the same ground" as the statutes. Trustees' opening brief at 31-32; *see Fasi*, 50 Haw. at 285, 439 P.2d at 211.

In effect, the Trustees' two "preemption-by-conflict" arguments suggest that Ordinance 91-95 conflicts with state law because it (1) "enters an area fully occupied" thereby and (2) is "duplicative" (*i.e.*, "coextensive") with respect thereto. *See Sherwin-Williams*, 4 Cal. 4th at 897, 16 Cal.Rptr.2d at

---

26. Article VIII of the Hawai'i Constitution (1978), delineates the legal status and general powers of "local government," *i.e.*, the counties and other "political subdivisions within the [s]tate." *See* article VIII, section 1. Article VIII, section 6 provides that "[t]his article shall not limit the power of the legislature to enact laws of statewide concern."

27. HRS Title 6 (1985 and Supp.1992) is the comprehensive statutory scheme governing "county organization and administration." *See supra* at 1206-07. HRS ch. 50 (1985) (charter commissions) is subsumed within Title 6. HRS § 50-15 (1985) provides:

> *Reserved powers.* Notwithstanding the provisions of this chapter, there is expressly reserved to the state legislature the power to enact all laws of general application throughout the [s]tate on matters of concern and interest and laws relating to the fiscal powers of the counties, and neither a charter nor ordinances adopted under a charter shall be in conflict therewith.

"HRS § 50-15, a statutory miniature 'supremacy clause' ... [,] is a statutory enactment of provisions contained in [article VIII] of our State Constitution." *Salavea v. City and County of Honolulu*, 55 Haw. 216, 218-19, 517 P.2d 51, 53 (1973).

28. Article IX of the Hawai'i Constitution (1978) governs "public health and welfare." Article IX, section 5, entitled "housing, slum clearance, development and rehabilitation," provides:

> The [s]tate shall have the power to provide for, *or assist in*, housing, slum clearance and the development or rehabilitation of substandard areas. The exercise of such power is deemed to be for a public use and purpose.

(Emphasis added.) " '[I]f the words used in a constitutional provision ... are clear and unambiguous, they are to be construed as they are written.' " *Hawaii Gov't Employees' Ass'n v. County of Maui*, 59 Haw. 65, 76, 576 P.2d 1029, 1036 (1978) (quoting *Spears v. Honda*, 51 Haw. 1, 6, 449 P.2d 130, 134, *reh. denied*, 51 Haw. 103, 449 P.2d 130 (1968)). It is critical to our analysis of the question before us that, insofar as the state is accorded the power, *inter alia*, to "assist in" the matters that are the subject of article IX, section 5, it is self-evident from the provision's plain language that the state's powers are not "exclusive" thereto. In HRS ch. 53 (1985 and Supp.1992), for example, the state has empowered the counties to undertake urban renewal projects—a subject inextricably intertwined with "housing."

29. In *Fasi v. City and County of Honolulu*, 50 Haw. 277, 439 P.2d 206 (1968), the two issues on appeal were "first, whether the legislature has the power to amend or repeal any provision of the city and county charter; and, second, if the legislature has such power, whether it amended or repealed [a charter provision] by its enactment of [a state statute]." *Id.* at 279, 439 P.2d at 208. *Fasi* is therefore inapposite to the question before us for at least two reasons, each of which implies the other. First, *Fasi* was not a preemption case at all; rather, it dealt with the issue of "repeal by implication," *id.* at 285, 439 P.2d at 211, a subject not before us. Indeed, the construct of "preemption" was nowhere invoked in the decision. Second, the question in *Fasi* was whether a state statute amended or impliedly repealed a *previously enacted* ordinance; in the present case, the diametric opposite is true—the statutes on which the Trustees rely *preexisted* Ordinance 91-95 and there is no claim that the ordinance amends or impliedly repeals anything. That is precisely why *Fasi* is not a preemption case.

217–18, 844 P.2d at 536–37. The Trustees are mistaken on both counts.

■ None of this court's decisions addressing the question whether a municipal ordinance is preempted by a state statutory scheme have explicitly dealt with constitutional issues. However, article VIII, section 6 of the Hawai'i Constitution and HRS § 50–15 are necessarily implicated whenever the question of conflict arises because the preemption doctrine raises issues regarding the supremacy of state law. *See* 2 R.D. Rotunda, J.E. Nowak, and J.N. Young, *Treatise on Constitutional Law: Substance and Procedure* § 12.2 (2d ed. 1992).

Article VIII, section 6 was originally promulgated by the 1950 Constitutional Convention to "make clear" that the powers conferred upon the counties in article VIII did "not restrict any of the powers of the legislature on state matters." Stand.Comm.Rep. No. 74, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1950, at 230 (1960).

Thereafter, during the 1968 Constitutional Convention, the framers, "[i]n recommending retention [of article VIII, section 6], recognize[d] the sovereignty of the [s]tate over its political subdivisions and its inherent power to enact laws of statewide concern." Stand. Com.Rep. No. 53 (Majority), in 1 Proceedings of the Constitutional Convention of Hawai'i of 1968, at 232 (1973). *See also Marsland v. First Hawaiian Bank*, 70 Haw. 126, 133, 764 P.2d 1228, 1232 (1988) ("[A]lthough article VIII, section 2[ ] created 'home rule,' it did not repeal section 6[,] which reserves matters of statewide concern to the legislature."); *City and County of Honolulu v. Ariyoshi*, 67 Haw. 412, 416, 689 P.2d 757, 761 (1984) ("In order to give effect to section 6, the power of the legislature to enact laws of statewide concern cannot be diminished.").

In enacting the statute implementing article VIII, section 6, *i.e.*, HRS § 50–15, "the state legislature ... expressly retained the 'power to enact all laws of general application throughout the [s]tate on matters of concern

and interest,'" *Marsland*, 70 Haw. at 133, 764 P.2d at 1232 (footnote omitted), and subordinated to such laws all "ordinances adopted under a [county] charter ... in conflict therewith." [30]

■ Thus, if an ordinance truly conflicts with Hawai'i statutory law that is of statewide concern, then it is necessarily invalid because it violates article VIII, section 6 of the Hawai'i Constitution and HRS § 50–15— the state's supremacy provisions. A law "of general application throughout the state[ ] is a law of statewide concern within the meaning of article VIII, section 6[ ] of the Hawai['li ... Constitution." *Marsland*, 70 Haw. at 133, 764 P.2d at 1232.

Inasmuch as most state statutes will, by their very nature, govern matters of statewide concern, *see* 1A N.J. Singer, *Sutherland Statutory Construction* § 23.16, at 382 n. 1 (5th ed. 1991), we assume, *arguendo*, that HRS chs. 46, 101, 516, 516D, 519, 514A, and 421H do so as well. The question then becomes whether Ordinance 91–95 conflicts with these statutes, or any of them, in such a way as to result in its preemption. To answer the question, we must engage in a dual analysis.

a. *Ordinance 91–95 does not enter an area fully occupied by state law.*

■ On the assumption that HRS chs. 516, 516D, 519, 514A, and 421H govern matters of statewide concern within the meaning of article VIII, section 6 of the Hawai'i Constitution and HRS § 50–15, we now consider whether Ordinance 91–95 encroaches upon areas in which "the state has the exclusive power to legislate." *See* Trustees' opening brief at 31. Put differently, we consider whether Ordinance 91–95 has entered "an area fully occupied" by the statutes. *See Sherwin–Williams*, 4 Cal. 4th at 897, 16 Cal. Rptr.2d at 217–18, 844 P.2d at 536–37. As noted above, the ordinance would do so if it has entered areas that the legislature "has expressly manifested its intent to 'fully occu-

---

30. *See supra* note 27 and accompanying text.

py' ... or when it has impliedly done so."
*Id.*

In section III.B.1.b of this opinion, we concluded that: (1) by its own plain and unambiguous language, the subject matter of HRS ch. 516 (the Hawai'i Land Reform Act) is limited to the involuntary lease-to-fee conversion of single and dual family residential houselots; (2) HRS ch. 516 does not cover the same subject matter embraced within Ordinance 91–95; and (3) the legislature could not have intended HRS ch. 516 to be the exclusive legislation applicable to the involuntary lease-to-fee conversion of all residential leaseholds. That being the case, it necessarily follows that Ordinance 91–95 does not enter an area fully occupied by the Land Reform Act.

Similarly, in section III.B.1.c of this opinion, we concluded that: (1) HRS ch. 516D, while covering condominiums and cooperatives, merely mandates disclosure requirements and provisions for mandatory arbitration of rent negotiations and thus does not embrace the same subject matter covered by Ordinance 91–95; and (2) HRS chs. 519, 514A, and 421H each covers an area distinct from involuntary lease-to-fee conversion, and, accordingly, no legislative intent to preempt the subject of Ordinance 91–95 could be implied. That being the case, it likewise follows that the ordinance does not enter an area fully occupied by any of these statutes.

### b. *Ordinance 91–95 is not duplicative of state law.*

As a final matter, and again assuming that the statutes govern matters of statewide concern, we take up the question whether Ordinance 91–95 conflicts with HRS chs. 46, 101, 516, 516D, 519, 514A, and 421H because the ordinance "cover[s] the same ground" as the statutes. Trustees' opening brief at 31–32. In other words, we consider whether the ordinance is " 'duplicative' of general [state] law" on the basis that "it is coextensive therewith." *See Sherwin–Williams*, 4 Cal. 4th at 897, 16 Cal.Rptr.2d at 217, 844 P.2d at 536.

In section III.B.1.a of this opinion, we concluded that Ordinance 91–95 did not cover the same subject matter as that embraced within HRS §§ 46–61, 46–62, and ch. 101. It necessarily follows that the ordinance cannot be duplicative of the statutes by virtue of being coextensive with them.

By the same token, having concluded in sections III.B.1.b and III.B.2.a of this opinion that HRS ch. 516 does not cover the same subject matter as that embraced by the ordinance, it necessarily follows that the latter cannot be duplicative of the former by virtue of being coextensive with it. And having concluded in sections III.B.1.c and III.B.2.a of this opinion that HRS chs. 516D, 519, 514A, and 421H all cover subject matters distinct from that of Ordinance 91–95, the same result inevitably follows.

### 3. *Ordinance 91–95 is not preempted by state constitutional or statutory law.*

Because Ordinance 91–95 does not cover the same subject matter embraced within a comprehensive state statutory scheme disclosing an express or implied intent to be exclusive and uniform throughout the state, and because the ordinance does not conflict with state constitutional or statutory law on the basis that it enters an area fully occupied thereby or that it is duplicative with respect thereto, we hold that Ordinance 91–95 is not preempted by article VIII, section 6 and article IX, section 5 of the Hawai'i Constitution or by HRS chs. 46, 101, 516, 516D, 519, 514A, and 421H.

### IV. *CONCLUSION*

Based on the foregoing analysis, we answer the federal court's certified question as follows: According to Hawai'i state law, Ordinance 91–95 is not preempted by HRS chs. 46, 101, 516, 516D, 519, 514A, or 421H, as interpreted in conjunction with the Hawai'i Constitution.

KLEIN, Justice, dissenting with whom MOON, Chief Justice, joins.

I agree with the majority that the certified question before us encompasses both the is-

sue whether the City and County of Honolulu (City) had the authority to enact Ordinance 91–95 and the issue whether Ordinance 91–95 is preempted by state law. For the reasons set forth below, however, I do not agree that the City had the authority to enact Ordinance 91–95. Because I believe that the certified question can be answered on this basis alone, I find it unnecessary to reach the preemption issue.

## I.

*The City's authority to exercise the power of eminent domain is derived exclusively from statutory grants of that authority.*

"Article VIII of the Hawai['̄]i State Constitution defines the relationship ·between the state and county governments. Article VIII, section 1, authorized the state legislature to create the counties and grant the counties such power as they [sic] deem necessary." *Marsland v. First Hawaiian Bank,* 70 Haw. 126, 132, 764 P.2d 1228, 1232 (1988).[1] Although Article VIII, section 2, establishes the counties' "home rule" powers with respect to charter provisions concerning the structure and organization of county government, the constitutional protection afforded counties against legislative intrusion is limited. *Id.* at 132–33, 764 P.2d at 1232 (citations omitted).[2]

The City does not appear to dispute that it has no inherent power of eminent domain, *see* 11 *McQuillin Municipal Corporations* § 32.12 at 324 (3d ed. 1991) (*McQuillin* ), or that it "may exercise only those powers which have been delegated to [the counties] by the State legislature." *In re Application of Anamizu,* 52 Haw. 550, 553, 481 P.2d 116, 118 (1971). The City contends, however, that the legislature has granted eminent domain

powers to the several counties pursuant to chapters 46 and 101 of the Hawai'i Revised Statutes (HRS). Whether the City has the authority to exercise the power of eminent domain for a particular use, in this case condominium lease-to-fee conversion (*i.e.,* condemnation of lessors' leased fee interests in condominium developments, cooperative housing corporation developments and planned unit developments for transfer to their lessees), thus becomes purely a question of statutory interpretation.

"Our primary duty in interpreting and applying statutes is to ascertain and give effect to the legislature's intention to the fullest degree." *Methven–Abreu v. Hawaiian Ins. & Guar. Co., Ltd.,* 73 Haw. 385, 392, 834 P.2d 279, 284, *recon. denied,* 73 Haw. 625, 838 P.2d 860 (1992) (citation omitted). Although, "[t]he intention of the legislature is to be obtained primarily from the language contained in the statute itself," *Kam v. Noh,* 70 Haw. 321, 325, 770 P.2d 414, 416 (1989),

> we have rejected an approach to statutory construction which limits us to the words of a statute ... for when aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination.

*Treloar v. Swinerton & Walberg Co.,* 65 Haw. 415, 421, 653 P.2d 420, 424 (1982) (citations omitted). Thus, the plain language rule of statutory construction, *see Sherman v. Sawyer,* 63 Haw. 55, 59, 621 P.2d 346, 349 (1980),

> does not preclude an examination of sources other than the language of the statute itself even when the language appears clear upon perfunctory review.

1. Article VIII, section 1, of the Hawai'i Constitution (emphasis added) provides:
   The legislature shall create counties, and may create other political subdivisions within the State, and provide for the government thereof. *Each political subdivision shall have and exercise such powers as shall be conferred under general laws.*

2. Article VIII, section 2, of the Hawai'i Constitution (emphasis added) provides in pertinent part:

> Charter provisions with respect to a political subdivision's executive, legislative and administrative structure and organization shall be superior to statutory provisions, *subject to the authority of the legislature to enact general laws allocating and reallocating powers and functions.*

Were this not the case, a court may be unable to adequately discern the underlying policy which the legislature seeks to promulgate and, thus, would be unable to determine if a literal construction would produce an absurd or unjust result, inconsistent with the policies of the statute.

*Survivors of Medeiros v. Maui Land & Pineapple Co.*, 66 Haw. 290, 297, 660 P.2d 1316, 1321 (1983) (citation omitted). With these principles in mind, I now turn to an examination of the relevant statutes.

## II.

*The power of eminent domain referred to in HRS § 46–1.5(6) is limited by the provisions of HRS § 46–61.*

The statutes relating to the scope of the City's authority to exercise the power of eminent domain, HRS §§ 46–1.5 (Supp.1992), 46–61 (1985), and 101–2 (1985),[3] must be read in pari materia. HRS § 1–16 (1985); *Zator v. State Farm Mut. Auto. Ins. Co.*, 69 Haw. 594, 597, 752 P.2d 1073, 1075 (1988). HRS § 46–1.5(6) provides:

> Subject to general law, each county shall have the following powers and shall be subject to the following liabilities and limitations:
>
> \* \* \* \* \* \*
>
> (6) Each county shall have the power to exercise the power of condemnation by

eminent domain when it is in the public interest to do so.

"On superficial examination" it might appear that this provision grants broad powers of eminent domain to the counties, limited only by the requirement that the powers be exercised "in the public interest." Closer examination of the language of the statute, application of principles of statutory construction, and a review of the legislative history, however, all demonstrate that the power of eminent domain referred to in HRS § 46–1.5(6) is limited by the provisions of HRS § 46–61.

HRS § 46–1.5 specifically provides that all powers set forth therein are "[s]ubject to general law." "In its broadest sense, the term 'general laws' ... denotes laws which apply uniformly throughout all political subdivisions of the State." *Bulgo v. Maui County*, 50 Haw. 51, 58, 430 P.2d 321, 326 (1967). HRS § 46–61 is one such general law as it appears in Subtitle 1 of Title 6 of the HRS entitled "Provisions common to all counties" and grants specific powers of eminent domain to "[e]ach county." Thus, the broad authority apparently granted in HRS § 46–1.5(6) is subject to any limitations imposed by HRS § 46–61.

Furthermore, in addition to the "subject to general law" caveat, established principles of statutory construction tell us that "when the legislature expresses things through a list, the court assumes that what is not listed is excluded".[4] 2A *Sutherland Statutory Construction* § 47.23 at 216, 217 (5th ed. 1992) (*Sutherland*) ("enumeration weakens [the force of the general law] as to things not

---

**3.** I agree with the majority that HRS § 46–62 (1985) "simply incorporates the *procedures* prescribed by HRS ch. 101." Majority at 1202 (emphasis added). There is nothing in the language or legislative history of HRS § 46–62 to indicate that it was intended to enlarge or limit the uses for which the counties could exercise their powers of eminent domain.

**4.** This rule of statutory construction, sometimes referred to as *expressio unius est exclusio alterius,* is somewhat similar to the rule of construction relied on by the majority that "where there is a 'plainly irreconcilable' conflict between a general and a specific statute concerning the same subject matter, the specific will be favored." Majority at 1202 (quoting *Mahiai v. Suwa*, 69 Haw. 349, 356, 742 P.2d 359, 366 (1987)). The *Mahiai* rule, however, only applies when two statutes

directly conflict. *Compare State v. Spencer*, 68 Haw. 622, 725 P.2d 799 (1986) (applying rule where one statute provided that any offense defined outside of the Hawai'i Penal Code (HPC) was a class C felony and another statute, although defining an offense outside of the HPC, specifically provided that the offense was a class B felony) *with State v. Pacariem*, 67 Haw. 46, 677 P.2d 463 (1984) (not applying rule where one statute provided for special indeterminate terms of imprisonment not to exceed eight years in lieu of other authorized sentences for young adults convicted of class A felonies other than murder and another statute provided for mandatory life sentences for persons convicted of attempted murder). The majority correctly concludes that the *Mahiai* rule does not apply in the instant case because HRS § 46–1.5(6) and HRS § 46–61 do not directly conflict. The conclusion that the

expressed."). Thus, the enumeration of specific uses in HRS § 46–61 limits the apparent grant of general powers in HRS § 46–1.5(6).

Finally, examination of the legislative history reveals that the apparent grant of broad authority in HRS § 46–1.5(6) has always been limited by the provisions of HRS § 46–61. The predecessor to HRS § 46–61 was first enacted on April 17, 1907 and clearly limited the scope of the counties' powers of eminent domain to "certain public purposes." Act 67, § 1, 1907 Haw.Sess.Laws 85 (Act 67). Act 67 was entitled "an act to provide for the exercise by the counties of the power of eminent domain for certain public purposes." It did not contain the "other public uses" clause presently in HRS § 46–61 but contained only an enumerated list of specific uses. *Id.* Later that month, on April 30, 1907, the City and County of Honolulu was incorporated. Act 118, 1907 Haw.Sess.Laws 200 (Act 118). Act 118 included the predecessor to HRS § 46–1.5(6) [5] that gave the board of supervisors the power "to purchase or acquire by condemnation such property as may be needed for public use." *Id.*, § 23 at 207. A general rule of statutory construction states that "repeals by implication are not favored and that if effect can reasonably be

given to two statutes, it is proper to presume that the earlier statute is to remain in force and that the later statute did not repeal it." *Reefshare, Ltd. v. Nagata,* 70 Haw. 93, 97, 762 P.2d 169, 172 (1988). Application of this rule leads to the conclusion that the limitation on the counties' powers of eminent domain imposed by Act 67 remained in force upon the passage of Act 118. Thus, from the outset, the exercise of the City's power of eminent domain was limited to certain enumerated public purposes. Although both statutes have been amended from time to time over the past eighty years, the relationship between the two statutes has not changed. Therefore, the power of eminent domain referred to in HRS § 46–1.5(6) continues to be limited by the provisions of HRS § 46–61.[6]

### III.

*The "other public uses" clause in HRS § 46–61 was not intended to grant the counties the authority to exercise the power of eminent domain for all unenumerated public uses.*

The analysis next turns to the limits on the exercise of eminent domain powers imposed

---

*Mahiai* rule is inapplicable, however, does not mean that the statute with the enumerated list has no effect on the general statute. Such a result would be contrary to the direction in *Mahiai* that "where the statutes simply overlap in their application, *effect will be given to both* if possible." 69 Haw. at 356–57, 742 P.2d at 366 (emphasis added). The rule of *expressio unius est exclusio alterius* applies precisely in order to give effect to both statutes.

5. When the legislature enacted HRS § 46–1.5(6) in 1988, it was merely "codifying existing county condemnation powers." Hse.Stand.Comm.Rep. No. 433–88, in 1988 House Journal, at 1006.

6. The majority takes issue with the application of the rule of *expressio unius est exclusio alterius* to determine the scope of the authority granted by HRS § 46–1.5(6). Majority at 1204. The majority's position is that "[t]he principle of *expressio unius est exclusion alterius* is inapplicable to HRS § 46–61 ... because the 'other public uses within the purview of HRS § 101–2' clause is an element of [HRS § 46–61]'s 'list.'" *Id.* This position is apparently based on the majority's belief that HRS § 46–61 includes "any unenumerated 'other public uses' consonant with HRS § 101–2." *Id.* at 1202. The interpretation of the

"other public uses" clause, however, should not determine the applicability of the principle of *expressio unius est exclusion alterius*. The conclusion that HRS § 46–1.5(6) only grants the counties the authority to exercise the power of eminent domain as set forth in HRS § 46–61 does not in any way preclude the "other public uses" clause from being interpreted as allowing the counties to exercise the power of eminent domain for any constitutionally valid public use. On the other hand, if the apparent broad grant of authority in HRS § 46–1.5(6) were not limited by the provisions of HRS § 46–61, the City could derive its authority to condemn for condominium lease-to-fee conversion exclusively from HRS § 46–1.5(6), and we would never have to consider the proper interpretation of the "other public uses" clause.

In any case, the majority does not contest either that HRS § 46–1.5(6) is expressly "subject to general law" or that HRS § 46–61 is one such general law. Nor does the majority challenge the analysis of the legislative history indicating that the apparent broad grant of authority in HRS § 46–1.5(6) has always been bounded by HRS § 46–61. Therefore, I remain confident with the conclusion that the power of eminent domain referred to in HRS § 46–1.5(6) is limited by the provisions of HRS § 46–61.

by HRS § 46–61. Condominium lease-to-fee conversion is clearly not among the specifically enumerated uses. Therefore, the City's authority to exercise the power of eminent domain pursuant to Ordinance 91–95 can only be derived from the language in HRS § 46–61 that states that the counties may exercise the power of eminent domain for "other public uses within the purview of section 101–2." Because HRS § 101–2 places no limits on the public uses for which the power of eminent domain may be exercised,[7] under a literal reading of HRS § 46–61, the several counties would have the authority to exercise the power of eminent domain for *any* constitutionally valid public use. Under this interpretation, the enumerated list of specific uses preceding the "other public uses" clause of HRS § 46–61 is entirely unnecessary. Such a result, however, is contrary to the

cardinal rule of statutory construction that courts are bound, if rational and practicable, to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimate-

ly found which will give force to and preserve all the words of the statute.

*Methven–Abreu v. Hawaiian Ins. & Guar. Co., Ltd.,* 73 Haw. 385, 392, 834 P.2d 279, 284, *recon. denied,* 73 Haw. 625, 838 P.2d 860 (1992) (citation omitted). Moreover, HRS §§ 101–13 (1985)[8] and 101–14 (1985)[9] make it clear that the counties do not have the virtually unlimited authority to condemn property that a literal reading would indicate, but are limited to purposes that are within the scope of their governmental powers. Thus, HRS § 46–61 is ambiguous. *See State v. Sylva,* 61 Haw. 385, 388, 605 P.2d 496, 498 (1980) ("When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute an ambiguity exists."). As a result, extrinsic aids to statutory construction, in particular the legislative history, must be examined in order to ascertain the legislature's intent.

Prior to 1951, HRS § 46–61[10] did not contain the troublesome "other public uses" clause. When initially enacted in 1907, the statute unambiguously limited the uses for which the counties could exercise eminent domain powers. Act 67, § 1, 1907 Haw.Sess.

7. HRS § 101–2 states that "[p]rivate property may be taken for public use." This provision essentially echoes the constitutional "public use" requirements of the fifth amendment of the United States Constitution and article I, section 20 of the Hawai'i Constitution. Moreover, the legislative history clearly indicates that the legislature did not intend to place any limits on the exercise of eminent domain powers beyond constitutional requirements:

[T]his measure provides generally that the power of eminent domain may be exercised for any "public use" instead of, as at present, attempting to define minutely each public use or purpose. Your committee believes that the question as to whether any particular use is a public use so as to permit the exercise of the power of eminent domain for the acquisition of property for such purpose, is a judicial one under the [United States] Constitution and the Hawaiian Organic Act (or State Constitution, when Hawai'i becomes a State), and that it is neither necessary nor desirable for the legislature to attempt to define each particular public use.

Sen.Stand.Comm.Rep. No. 177, in 1951 Senate Journal, at 541. *See also* Hse.Stand.Comm.Rep. No. 473, in 1951 House Journal, at 527 (committee report on "substantially identical" version of

the bill originating in the House of Representatives); Act 12, § 6, 1951 Haw.Sess.Laws 52, 61.

8. HRS § 101–13 (emphasis added) provides in pertinent part:

Whenever any county deems it advisable or necessary to exercise the right of eminent domain *in the furtherance of any governmental power,* the proceedings may be instituted as provided in section 101–14[.]

9. HRS § 101–14 (emphasis added) provides in pertinent part:

Any county may institute proceedings ... for the condemnation of property within the county *for any of the purposes provided in this part which are within the powers granted to the county.*

10. The essential provisions of HRS § 46–61 were first enacted during the 1907 legislative session. Act 67, § 1, 1907 Haw.Sess.Laws 85. They were subsequently codified in the Revised Laws of Hawai'i (RLH) § 1952 (1925), § 2300 (1935), § 6101 (1945), and § 141–1 (1955). For the sake of convenience, I will refer to all of these provisions as HRS § 46–61.

Laws 85 (Act 67).[11] The list of permissible uses was amended from time to time, *see* Act 97, § 1, 1913 Haw.Sess.Laws 138 (adding "schools, hospitals, jails, court houses, police and fire stations, city halls, office and other public buildings, cemeteries, parks, playgrounds and ... land from which to obtain earth, gravel, stones and other material for the construction of roads and other public works"); Act 153, § 1, 1943 Haw.Sess.Laws 99 (adding "public off-street parking facilities and accommodations"), but was consistently treated as limiting the counties' exercise of eminent domain powers to the uses specifically enumerated. In addition, when HRS § 46–61 was first enacted, HRS § 101–2 [12] contained an enumerated list of uses for which eminent domain powers could be exercised by the state. Act 45, § 1, 1893–1896 Haw.Sess.Laws 104 (Act 45).[13] The enumerated list in HRS § 101–2 was also amended on occasion. *See* Act 10, § 1, 1909 Haw.Sess. Laws 9 (adding "schools and school recreation grounds"); Act 59, § 1, 1925 Haw.Sess. Laws 76 (adding "landing fields and hangars, and landing harbors for airships"); Act 149, § 1, 1941 Haw.Sess.Laws 2 (adding "sites for triangulation stations and for rights of way for access thereto").

In 1951, however, significant changes were made to both HRS §§ 46–61 and 101–2. Act 12, §§ 1(b), 5(a), 1951 Haw.Sess.Laws 52, 52–53, 61 (Act 12). The amendments to HRS § 101–2 included removing the enumerated list of public uses and replacing it with the simple provision that "[p]rivate property may be taken for public use." In section 6 of Act 12, the legislature indicated its intent that the amended provision encompass *all* valid public uses.[14] The legislative history further reinforces the conclusion that HRS § 101–2 places no statutory limitation on the uses for which the state can exercise its power of eminent domain. *See* dissent at 1218 n. 7.

HRS § 46–61 was also amended by Act 12. The only amendment, however, was the addition of the "other public uses" clause. Significantly, the addition of the "other public uses" clause was not among the amendments proposed in the original bill, but was one of over a dozen changes made to the bill by the Senate Judiciary Committee (SJC). Sen. Stand.Comm.Rep. No. 177, in 1951 Senate Journal, at 541. The SJC made no specific comment regarding the intended effect of the addition of the "other public uses" clause but merely described all of the changes collec-

11. Act 67 provided in pertinent part:

Each County shall have the following specific powers:
   To take private property for the purpose of establishing, laying out, extending and widening streets, avenues, boulevards, alleys and other public highways and roads, for pumping stations, water works, reservoirs, wells and public squares, and for rights of way for drains, sewers, pipe lines, aqueducts and other conduits for distributing water to the public[.]

12. The essential provisions of HRS § 101–2 were first enacted during the 1896 legislative session. Act 45, § 1, 1893–1896 Haw.Sess.Laws 104. They were subsequently codified in the RLH § 808 (1925), § 50 (1935), § 301 (1945), and § 8–2 (1955). For the sake of convenience, I will refer to all of these provisions as HRS § 101–2.

13. Act 45 provided in pertinent part:

   Private property may be taken for the following purposes, which are declared to be public uses, to wit: sites for public buildings, fortifications, magazines, arsenals, navy-yards, navy and army stations, light houses, range and beacon lights, cemeteries, quarantine stations,

pest-houses, hospitals, dumping places for garbage and refuse material, wharves, docks, piers, dams, reservoirs and bridges, also all necessary land over which to construct roads, canals, ditches, flumes, aqueducts, pipe lines and sewers; also all necessary land for growth and protection of forests, public squares and pleasure grounds; also all necessary land for improving any harbor, river or stream, removing obstructions therefrom, widening, deepening or straightening their channels; also all necessary land from which to obtain earth, gravel, stones, trees, timber, and all necessary material for the construction of any public work.

14. Section 6 of Act 12 provided:

   The amendment of [HRS § 101–2] by this Act shall not be interpreted as a legislative declaration that the purposes enumerated in said section before amendment are not public purposes, but said section [101–2], as so amended, shall be deemed to include all public purposes specifically mentioned therein before such amendment and any other additional public purposes.

tively as "necessary to clarify the bill, more fully accomplish its purpose to achieve uniformity in procedure, and further improve its provisions." *Id.* at 542. When the bill was later examined by the House Judiciary Committee, the changes were described as "definitions and some additional provisions as well as some minor changes of verbiage ... which serve to further improve the measure as to form and to better coordinate its provisions with other laws relating to the subject of the [sic] eminent domain." Given the cursory comments made regarding the SJC's changes as a whole and the absence of any particular comments regarding the addition of the "other public uses" clause, I cannot accept the contention that the legislature intended to drastically enlarge the scope of the counties' authority to exercise the power of eminent domain.

In addition to failing to indicate its intent to enlarge the counties' eminent domain authority, the legislature chose to retain the enumerated list of permissible uses in HRS § 46–61. The retention of the enumerated list in HRS § 46–61, in direct contrast to the elimination of the enumerated list in HRS § 101–2, must be deemed intentional and given special interpretative significance, particularly where the disparate treatment occurred in a single act. *See Levy v. Kimball,* 51 Haw. 540, 544–45, 465 P.2d 580, 583 (1970) (giving special interpretative significance to differences in words and phraseology between state statute and the federal statute that it followed). The legislature clearly understood that if it wished to remove statutory restrictions on eminent domain powers it could eliminate the enumerated list of permissible uses. *See* dissent at 1219 n. 14. The legislature, however, chose to retain the enumerated list in HRS § 46–61. The legislature's failure to eliminate the enumerated list in HRS § 46–61 could "only be explained by an oversight on its part or by its intention to retain the [limitations]. I think the latter. As we stated long ago, courts will not presume an oversight on the part of the legislature where such presumption is avoidable." *Reefshare, Ltd. v. Nagata,* 70 Haw. 93, 98,

762 P.2d 169, 173 (1988). Thus, I believe that one must presume that by retaining the enumerated list in HRS § 46–61 the legislature intended to continue to limit the counties' authority to exercise the power of eminent domain.

Further evidence of the legislative intent is found in subsequent acts of the legislature. *See Gomes v. Campbell,* 37 Haw. 252, 257 (1945) (quoting 50 Am.Jur. *Statutes* § 337) ("[I]n determining the meaning of a statute, [it is proper] to take into consideration subsequent action of the legislature[.] ... Indeed, it has been held that if it can be gathered from a subsequent statute in pari materia what meaning the legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute."). In this regard, the act amending HRS § 46–61, Act 96, § 1, 1951 Haw.Sess.Laws 322 (Act 96), enacted a mere 17 days after the "other public uses" clause was added, has great probative force. *See Kam v. Noh,* 70 Haw. 321, 326, 770 P.2d 414, 417 (1989) ("[T]he rule that statutes 'in pari materia' should be construed together has the greatest probative force in the case of statutes relating to the same subject matter passed at the same session of the legislature[.]"). Act 96 added "for flood control" and "for reclamation of swamp lands" as uses for which the counties could exercise the power of eminent domain, and the legislative history indicates that the amendment was intended to "expand the purposes for which private property may be condemned." Hse. Stand.Comm.Rep. No. 637, in 1951 House Journal, at 562. Thus, the legislature clearly felt that the enumerated list in HRS § 46–61 continued to limit the counties' authority to exercise the power of eminent domain. Moreover, if the "other public uses" clause already encompassed all constitutionally valid public uses, then the amendments of Act 96 were entirely unnecessary. We have stated, however, that "[w]e cannot presume that the legislature intended to enact an unnecessary amendment." *In re Taxes of Hawaiian Land Co.,* 53 Haw. 45, 60–61, 487 P.2d 1070,

1080 (1971), *appeal dismissed*, 405 U.S. 907, 92 S.Ct. 938, 30 L.Ed.2d 778, *reh'g denied*, 405 U.S. 1048, 92 S.Ct. 1308, 31 L.Ed.2d 591 (1972) (footnote omitted). Furthermore, the enumerated list of HRS § 46–61 was again amended in 1965. Act 97, §§ 4, 8, 1965 Haw.Sess.Laws 116 (Act 97). In that amendment, "schools, hospitals, . . . [and] courthouses" were removed from the enumerated list in HRS § 46–61. As with the addition of permissible uses in 1951, we must presume that the legislature intended the removal of uses from the enumerated list to have an effect on the scope of the counties' authority to exercise the power of eminent domain.[15]

Based on the disparate manner in which HRS § 46–61 and 101–2 were amended by Act 12 in 1951, the lack of legislative comment concerning a substantial enlargement of the counties' powers, and the fact that the legislature continued to both add and delete items from the enumerated list of HRS § 46–61 subsequent to the addition of the "other public uses" clause, I believe it is abundantly clear that the legislature did not intend to authorize the several counties to exercise the power of eminent domain for any and all unenumerated constitutionally valid public uses. *Cf. Pacific Ins. Co. v. Oregon Auto. Ins. Co.*, 53 Haw. 208, 212, 490 P.2d 899, 902 (1971) (holding that "[t]he phrase 'for any purpose' in [RLH 1955 § 160–10(e)] is not all-encompassing, but is restricted to a reasonable construction by [the] context of the entire statute and the purposes of the act").

### IV.

*The "other public uses" clause of HRS § 46–61 was intended to account for grants to the counties of the power of eminent domain made in statutory provisions other than HRS § 46–61 itself.*

Having concluded that HRS § 46–61 limits the counties' authority to exercise the power of eminent domain, we must determine what the legislature intended when it amended HRS § 46–61 to include "other public uses within the purview of section 101–2." It is conceivable that the amendment was inadvertently made and should be given no effect whatsoever. *See* majority at 22–23 (giving no effect to amendment that substituted "ordinance" for "statute" in the concluding proviso of HRS § 46–1.5(13) (Supp.1992)). If possible, however, we should not interpret a statute "where the result would be the emasculation or deletion of [a provision]." *Hawaiian Airlines Inc. v. State Dept. of Taxation*, 68 Haw. 391, 398, 716 P.2d 1138, 1143–44 (1986).

The rule of statutory construction of *ejusdem generis* often applies when a statute contains an enumerated list followed by a general term. "Under this established rule of statutory construction, where words of general description follow the enumeration of certain things, those words are restricted in their meaning to objects of like kind and character with those specified." *Jones v. Hawaiian Elec. Co., Inc.*, 64 Haw. 289, 294, 639 P.2d 1103, 1108 (1982). At first glance the rule would appear to be particularly applicable in the instant case as we struggle to give effect to both the enumerated list of uses and the "other public uses" clause, for we have stated that

> [t]he purpose of the rule is to give effect to both the particular and general words, by treating the particular words as indicating the class, and the general words as extending the provisions of the statute to everything embraced in that class, though not specifically named by the particular words.

*State v. Yan*, 44 Haw. 370, 376–77, 355 P.2d 25, 29 (1960). The rule only applies, however,

> when the following conditions exist: (1) the statute contains an enumeration by specific words[;] (2) the members of the enumer-

---

**15.** According to the majority, the amendments of Act 12 gave the counties "the unfettered power to take private property 'for public use.' " Majority at 1204. If this were true, the City could condemn property to build a school, hospital, or courthouse. Act 97, however, expressly fixed the responsibility for schools, hospitals, and courts in the state government and rescinded the counties' authority to condemn property for those purposes. Thus, it is clear that the counties do not have the unfettered power to take private property for every public use.

ation constitute a class; (3) the class is not exhausted by the enumeration; (4) a general term follows the enumeration[;] and (5) there is not clearly manifested an intent that the general term be given a broader meaning than the doctrine requires.

*Id.* at 377, 355 P.2d at 29 (quoting 2 *Sutherland* § 4910 at 400 (3d ed. 1943)). Unfortunately, in the instant case, the uses on the enumerated list do not constitute a discernible class. The rule of *ejusdem generis* is, therefore, inapplicable. *Compare Yan* (not applying rule where enumerated list did not constitute a class as it contained only one item) *with Jones* (applying rule to enumerated list where items on list, "stocks and stock certificates, bonds, [and] notes," constituted a class of items "usually issued as a means of raising funds" that "become part of the capital structure" of the issuer).

A construction of the statute that would give effect to the "other public uses" clause without rendering the enumerated list meaningless can be found, however, by examining the manner by which the legislature has granted eminent domain powers to the counties since the clause was added to HRS § 46–61 in 1951. As noted above, on some occasions, the legislature has directly amended the enumerated list of HRS § 46–61. *See*

dissent at 1220–21. On other occasions, however, the legislature has granted eminent domain powers for specific uses that were not among the uses on the enumerated list. For example, the legislature gave the counties the power to condemn property "for the purpose of developing, constructing, and providing low and moderate income housing," HRS § 46–15.1(a)(2) (1985 & Supp.1992),[16] and for the purpose of providing mass transportation services. HRS § 51–1 (1985).[17] In light of the two methods by which the state has granted eminent domain powers to the counties since the addition of the "other public uses" clause to HRS § 46–61, the clause should be interpreted as simply making clear that the several counties can exercise the power of eminent domain for public uses not on the enumerated list of HRS § 46–61 when authorized to do so by other statutes. This construction gives effect to all of the language of the statute, comports with the applicable rules of statutory construction, and, I believe, is the construction that the legislature intended.[18]

## V.

### Conclusion

The legislature has neither amended the enumerated list in HRS § 46–61 nor enacted

---

**16.** HRS § 46–15.1(a)(2) (emphasis added) provides in pertinent part:

> Any law to the contrary notwithstanding, any county shall have and may exercise the same powers, subject to applicable limitations, as those granted the housing finance and development corporation pursuant to chapter 201E insofar as such powers may be reasonably construed to be exercisable by a county *for the purpose of developing, constructing, and providing low and moderate income housing....* The powers shall include the power, subject to applicable limitations, to:
>
>     *   *   *   *   *   *
>
> (2) Acquire necessary land by lease, purchase, exchange, or *eminent domain* [.]

**17.** HRS § 51–1 (emphasis added) provides in pertinent part that "[e]very county of this State may acquire, *condemn,* purchase, lease, construct, extend, own, maintain, and operate mass transit systems[.]"

**18.** The majority assails this analysis as "pure speculation," arguing that the reason why the legislature acted in the way that it did is "ultimately unknowable." Majority at 1204. The

very concept of a single legislative intent, however, is a legal fiction that is inherently based on speculation. Whenever we endeavor to ascertain the legislature's intent, we are speculating as to the intentions of the individual legislators and, with the aid of established principles of statutory construction, attempting to adopt an interpretation that most closely approximates those intents. Thus, the fact that the legislature's reasons for acting are "ultimately unknowable" is not a sound basis for disregarding relevant legislative actions and applicable rules of construction. In fact, it is precisely because the legislature's reasons are ultimately unknowable that rules of construction have developed. The majority's lengthy quotation of Judge Posner reinforces that very point. *See* majority at 1201 n. 14.

Even accepting that the legislative intent is ultimately unknowable and that the canons of statutory construction discussed in the text "pull[ ] in opposite directions," *id.,* there are additional canons particularly applicable to legislative grants of eminent domain powers to local governments which "establish presumptions, based on substantive policy, for resolving indeterminate statutory cases." *Id.* First, statutes granting power to municipal corporations are interpreted strictly against the municipal corpo-

any other statutes granting the City the authority to exercise the power of eminent domain for condominium lease-to-fee conversions. Because the City's authority to exercise the power of eminent domain is derived exclusively from statutory grants of that power, I would hold that the City was without authority to enact Ordinance 91–95. I would, therefore, answer the certified question in the affirmative.

Accordingly, I dissent.

rations. 3 *Sutherland* § 64.02 at 260; 2 *McQuillin* § 10.18a at 1048 (3d ed. 1988). In addition, statutes granting the power of eminent domain are interpreted strictly against the grantee. 3 *Sutherland* § 64.06 at 284–85; 1A *Nichols on Eminent Domain* § 3.213[1] at 3–85 (3d ed. 1993); 11 *McQuillin* § 32.19 at 343. In conjunction, these principles reflect a strong policy against lightly allowing local governmental bodies to exercise the inherently sovereign power of eminent domain to divest individuals of their property. Moreover, if we cannot be certain whether the legislature intended to delegate eminent domain powers, we are well-advised to err against delegation: for if we erroneously allow the City to exercise powers it is not supposed to have, individuals will be wrongfully deprived of their property; whereas, if we erroneously prevent the City from exercising powers it is supposed to have, the result will merely be a delay until the legislature can enact a clearer statute. Therefore, where there is any doubt as to the scope of the delegation of eminent domain powers to the counties, we should adopt the narrowest interpretation that is reasonable.