**Ernestine Ching YOUNG, individually, and Ernestine C. Young, Trustee of the Wallace L. Young Trust dated April 12, 2005 (Residuary Trust), et al., Plaintiffs,**

v.

**CITY AND COUNTY OF HONOLULU, Defendant.**

Civil No. 07–00068 JMS/LEK.

United States District Court, D. Hawai'i.

April 29, 2009.

David A. Nakashima, Lerisa L. Heroldt, Alston Hunt Floyd & Ing, Honolulu, HI, for Plaintiffs.

Don S. Kitaoka, Brad Tamio Saito, Jesse K. Souki, Kyle K. Chang, Office of Corporation Counsel, Honolulu, HI, for Defendant.

*ORDER: (1) GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I–III OF THE FIRST AMENDED COMPLAINT; (2) DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I AND III OF THE FIRST AMENDED COMPLAINT; AND (3) DISMISSING REMAINING STATE LAW CLAIMS*

J. MICHAEL SEABRIGHT, District Judge.

## I. *INTRODUCTION*

On December 16, 1991, the Honolulu City Council (the "City Council") enacted into law Chapter 38, Revised Ordinances of Honolulu ("Chapter 38"), which allowed owners of long-term leasehold interests to convert them into fee interests through the City and County of Honolulu's (the "City" or "Defendant") power of eminent domain. Plaintiffs, who own leaseholds in the Admiral Thomas condominium project, located at 1221 Victoria Street, Honolulu, Hawaii (the "Admiral Thomas"), entered into contracts for Defendant to use its best efforts to acquire for Plaintiffs the leased fee interests in their properties pursuant to Chapter 38. Defendant initiated an eminent domain proceeding for most Plaintiffs (the "Condemnation Action"), but before additional Plaintiffs were added to the Condemnation Action, a Hawaii state court found that Chapter 38 did not apply to the Admiral Thomas and in any event, there were not enough qualified lessees as required by Chapter 38. While the Condemnation Action was on appeal, Chapter 38 was repealed.

In this action, Plaintiffs contend that Defendant's failure to add all of the Plaintiffs to the Condemnation Action and the repeal of Chapter 38 breached their contracts and violate their constitutional rights. Currently before the court is: (1) Defendant's Motion for Partial Summary Judgment on Plaintiffs' claims for violation of the Contracts Clause, Plaintiffs' substantive due process rights, and 42 U.S.C. § 1983; and (2) Plaintiffs' Motion for Partial Summary Judgment on their claims for violation of the Contracts Clause and 42 U.S.C. § 1983. Based on the following, the court finds that there is no genuine issue of material fact that Plaintiffs' constitutional rights were not violated and therefore GRANTS Defendant's Motion for Partial Summary Judgment and DENIES Plaintiffs' Motion for Partial Summary Judgment.

## II. *BACKGROUND*

### A. Factual Background

#### 1. *Chapter 38*

On December 16, 1991, the City Council enacted into law Chapter 38, which, along

with its corresponding "Rules of the Residential Condominium Cooperative and Planned Development Leasehold Conversion" (the "Rules"), set forth the authority, conditions, and process by which lessees under certain long-term leases of land could purchase the corresponding fee. Def.'s Concise Statement of Facts ("CSF") ¶¶ 2–3;[1] Pls.' Ex. 3. Chapter 38 charged the Department of Community Services ("DCS") with administering the process for leasehold conversion.[2] Def.'s CSF ¶ 6.

Chapter 38 and the Rules contemplated a multi-step process, which includes: (1) the lessee fills out an application and signs a contract with the City; (2) the Director of the DCS (the "Director") grants or denies preliminary approval based on the applications; (3) the Director provides notice and conducts a public hearing regarding whether the exercise of eminent domain is in the public interest; (4) the Director makes a finding of whether the exercise of eminent domain is in the public interest and if appropriate, grants the lessees' final approval; (5) the Director designates the relevant portions of the development for acquisition; and (6) the Director requests corporation counsel to prepare and present to the City Council a resolution for the exercise of eminent domain power. The steps are further described as follows:

To start the process for acquiring the fee, Chapter 38 and its Rules required that at least 50% of the lessees or at least 25 units in a project, whichever is less, apply for and qualify for Chapter 38 lease-to-fee conversions. *Id.* ¶ 4; Pls.' Ex. 1, § 38–2.2(a)(1). Lessees were required to (1) be at least 18 years of age; (2) be the owner-occupant of their units; (3) be bona fide residents of the City; (4) own no other fee simple interests in land within the City fit for residential purposes; (5) submit a letter of credit, certificate of deposit, proof of funds, or approved application from a lending institution; (6) submit an application for the purchase of the leased fee interest; and (7) execute a contract for the purchase of the fee interest with the City. Def.'s CSF ¶ 5; Pls.' Ex. 1, § 38–2.3(a).

The Rules required the Director to examine all applications and make a preliminary determination whether the applicant meets the requirements listed above. Pls.' Ex. 3, Rules ¶ 2–5. If the requirements were met, the Director gave notice of a public hearing, and afterwards "determine[d] whether or not the acquisition of the leased fee interest in the development ... through the exercise of the power of eminent domain ... will effectuate the public purpose of [Chapter 38]." *Id.* ¶¶ 2–6, 2–7.

If the Director found that acquisition through eminent domain was appropriate, the Rules required a period of negotiation between the lessees and the fee owner. *Id.* ¶ 2–8. If no agreement was made, the applicants were required to submit additional financial information, pay 50% of the allocated costs, and reaffirm their contracts with the City. *Id.* ¶ 2–10. Once these steps were completed, the applicants were notified if they received final approval. *Id.*

After this final approval, the Director was then required to designate the relevant portions of the development for acquisition, *id.* ¶ 2–11, and "request the corporation counsel to prepare and present to the City Council a Resolution for the exercise

---

1. Where the parties have agreed to certain facts, the court cites directly to the parties' respective CSF.

2. Although Chapter 38 lists the Department of Housing and Community Development as charged with processing applications, *see* Pls.' Ex. 1, § 38–1.7, it was later changed to the DCS.

of the power of eminent domain for the condemnation of the legal and equitable owner of the leased fee interest [and] request the corporation counsel to file the necessary legal action no later than 12 months after the designation." *Id.* ¶ 2–12. The Rules further contemplated that after a condemnation action began, "consent of the court shall be required in order to include the additional applicant [meeting the requirements of Chapter 38] as a defendant in a condemnation action." *Id.* ¶ 2–16.

### 2. *Plaintiffs' Contracts with Defendant*

Each Plaintiff owns or owned a leasehold interest in a residential condominium unit in the Admiral Thomas. Pls.' CSF ¶ 1; Def.'s CSF ¶ 1. Between 2001 and 2004, the parties entered into Leased Fee Interest Purchase Contracts (the "Contracts") for Defendant to acquire and transfer to each Plaintiff the leased fee interest in their properties through eminent domain. *See* Pls.' Exs. 3a-t. These Contracts were required by Chapter 38 and the Rules, and each Contract was secured by $1,000 consideration. Pls.' CSF ¶¶ 2–3.

The Contracts provide that each Plaintiff "agrees to accept from the City, and the City agrees to convey to [the individual Plaintiff], the [leased fee interest in the Admiral Thomas] on the terms stated in this [Contract]." Pls.' Exs. 3a-t. Those terms include Chapter 38 and its Rules, which the Contracts specifically incorporate by reference in the following provision:

> ORDINANCE AND RULES: All of the terms and conditions of [Chapter 38 and the Rules] promulgated by the City Department of Housing and Community Development and amended by the [DCS] which currently administers the implementation of Chapter 38 ROH are incorporated by reference into the

Agreement and made a part of it. The Ordinance and the Rules are binding on the Buyer and the City. In the event of any conflict between any provisions stated in the Ordinance and the Rules and this Agreement, the provisions contained in the Ordinance and the Rules shall control without invalidating or altering the remaining provisions of this Agreement.

*Id.* at Ex. A ¶ 5.

Under "Miscellaneous Provisions," the Contract states that the parties must use their best efforts in acquiring the fee through eminent domain:

> T. *Required Action by the Parties.* Each party named in this instrument agrees to execute the instruments and to diligently undertake the acts necessary to consummate the transaction contemplated by the Agreement. Each party shall use its best efforts to consummate the transaction contemplated by this instrument.
>
> . . .
>
> W. *Required Actions of Buyer and City.* Buyer and City agrees to execute such instruments and documents and to use their best efforts to perform the actions required in order to consummate the transaction contemplated by this instrument.

*Id.* at Ex. A ¶ 12.

The Contracts expressly state that they are binding and enforceable. *Id.* at Ex. A ¶ 12(e). Further, Defendant represented that the Contracts are valid and enforceable and corporation counsel approved the form and legality of the Contracts. Pls.' CSF ¶¶ 6–7.

### 3. *The Condemnation Action*

On May 2, 2002, after a properly noticed hearing was held, the DCS issued its "Finding of Effectuation of Public Purpose

by the Director," finding that "the acquisition of leased fee interests in the [Admiral Thomas] using the power of eminent domain of the City will effectuate the public purpose of Chapter 38." Pls.' Ex. 5; *see* Def.'s CSF ¶ 14.

Around September 13, 2002, certain Plaintiffs received notice that they satisfied the final approval requirements of Chapter 38 and the Rules. Pls.' Exs. 2 b, c, f, g, i, j, k, m, n, o, q, t. On October 11, 2002, the DCS designated 28 Admiral Thomas units for acquisition by the City through its eminent domain power ("DCS Designation"). Pls.' Ex. 7. Subsequently, on December 4, 2002, the City Council approved Council Resolution 02–301, which made a public purpose finding and authorized corporation counsel to initiate a Chapter 38 eminent domain proceeding regarding the leased fee interests for those Plaintiffs in the DCS Designation ("Group 1 Plaintiffs"). Pls.' CSF ¶ 14; Pls.' Ex. 8.

In early 2003, certain other Plaintiffs received notice that they satisfied the final approval requirements of Chapter 38 and the Rules. Pls.' Exs. 2a, d, h, l, s. On March 20, 2003, the DCS filed its "First Amendment" to the DCS Designation, designating six additional Admiral Thomas units for acquisition by the City through its eminent domain power. Pls.' Ex. 10. On April 23, 2002, the DCS filed its "Second Amendment" to the DCS Designation, designating one additional Admiral Thomas unit for acquisition. Pls.' Ex. 11.

On May 8, 2003, the City initiated an eminent domain proceeding seeking condemnation of 27 Admiral Thomas units pursuant to Chapter 38 and naming Plaintiffs' lessor First United Methodist Church ("FUMC") and Group 1 Plaintiffs as defendants (the "Condemnation Action"). Pls.' CSF ¶ 15; Def.'s CSF ¶ 17. On October 15, 2003, the City Council approved Council Resolution 03–152, which made a public purpose finding and authorized corporation

counsel to initiate eminent domain proceedings on behalf of the Plaintiffs subject to the First and Second Amendments to the DCS Designation ("Group 2 Plaintiffs"). Pls.' Ex. 12. On February 12, 2004, the City filed its First Amended Complaint, adding Group 2 Plaintiffs as defendants in the Condemnation Action. Def.'s CSF ¶ 22; Pls.' Ex. 13.

On April 20, 2004, the DCS filed its "Third Amendment" to the DCS Designation, designating five additional Admiral Thomas units for acquisition by the City through its eminent domain power. Pls.' Ex. 14. Unlike the other designees, the DCS did not introduce a resolution to the City Council authorizing the addition of these lessees ("Group 3 Plaintiffs") to the Condemnation Action. *See* Pls.' Ex. 15. Rather, on April 29, 2004, Group 1 and 2 Plaintiffs filed a motion for partial summary judgment regarding, among other things, their qualifications under Chapter 38. *See City & County of Honolulu v. Sherman,* 110 Hawai'i 39, 45, 129 P.3d 542, 548 (2006). FUMC countered with two motions for summary judgment of its own, and the City opposed FUMC's motions and joined Group 1 and 2 Plaintiffs' motion for summary judgment. Def.'s CSF ¶ 25.

On June 30, 2004, the Circuit Court found that Chapter 38 was inapplicable to the Admiral Thomas, and on July 8, 2004, the Circuit Court found, among other things, that there were not enough qualified original or properly-added applicants to meet the 25 unit threshold throughout the legal proceedings. *Sherman,* 110 Hawai'i at 48, 129 P.3d at 551. Judgment was subsequently entered on September 21, 2004, and the parties appealed in October 2004. *Id.*

On appeal, the Hawaii Supreme Court found that Chapter 38 applied to the Admiral Thomas and that there were "genuine issues of material fact regarding the

qualifications of individual lessees to acquire the fee pursuant to [Chapter 38]." *Id.* at 77, 129 P.3d at 580. The Hawaii Supreme Court therefore remanded the case back to the Circuit Court to determine whether there was a sufficient number of qualified Admiral Thomas units to proceed with condemnation. *Id.*

On remand, the Circuit Court found that there was an insufficient number of qualified applicants, ordered the City to pay FUMC's attorneys' fees and costs, and dismissed the action. Def.'s CSF ¶¶ 28–31. The Circuit Court's decision is currently on appeal. *Id.* ¶¶ 32–33.

### 4. Repeal of Chapter 38

During the pendency of the lessees' first appeal, Chapter 38 was repealed. *Id.* ¶ 27. Ordinance 05–001 specifically found that Chapter 38 no longer advanced a public purpose:

> [T]he purpose of Chapter 38 was to provide affordable housing and to strengthen the economy through fee ownership. Ordinance 91–95 lists "runaway land prices," "shortage of fee simple residential condominiums," "artificial inflation of land values," "lessees forced to access long-term leases ... which contains terms and conditions which are financially disadvantageous to them," "land values, artificially inflated by concentrated or single ownership," and "potential for economic instability and disruption on Oahu" as public purpose furthered by Chapter 38.
>
> The council finds that mandatory conversion of multi-family residential leaseholds under Chapter 38 is no longer needed to assuage the social and economic problems mentioned in Ordinance 91–95 and, therefore, no longer advances a public purpose for which the city should exercise its extraordinary powers of condemnation. The social and economic problems listed as the public pur-

poses furthered by Chapter 38 do not exist today to the same extent as they may have existed in 1991.

> The council further finds that a lessee purchasing a residential leasehold unit knew or should have known about the negative aspects of the lease prior to the purchase. Since 1990, such a lessee should have received a copy of the underlying lease. Since 1991, the lessee should have received a simplified disclosure of the salient terms of the lease agreement, including but not limited to, the remaining term of the lease, the rent renegotiation dates, the potential for significant increases in renegotiated rents, and the surrender clause.

Pls.' Ex. 26.

One issue facing the City Council was determining how the repeal would apply to individuals that had already begun the Chapter 38 process. The original bill, Bill 05–53 ("Bill 53"), introduced on August 2, 2004, provided:

> (a) This ordinance shall not affect any eminent domain proceeding authorized by the council before the effective date of this ordinance to acquire all or a portion of the leased fee interests to a development that has been validly designated.
>
> . . . .
>
> (b) Any designation of a development for leasehold conversion shall be invalid on the effective date of this ordinance if the council did not authorize before the effective date of this ordinance the eminent domain proceeding to acquire all or a portion of the leased fee interests to the development.

Pls.' Ex. 16; *see also* Def.'s CSF ¶ 10; Pls.' CSF ¶ 27.

City Council Member Charles Djou ("Djou") introduced a modified version of Bill 53 that would allow qualified applicants to join ongoing condemnation ac-

tions. Specifically, Djou's proposal provided that the repeal would not apply to any development that (1) was already designated by the Director, or (2) has a sufficient number of applications who have executed contracts with the City. Pls.' Ex. 19. The City Council rejected Djou's proposal. Pls.' CSF ¶ 30.

In comparison, James Mee ("Mee"), an attorney for FUMC, submitted proposed amendments to Bill 53 to clarify that only those units that were already designated by the DCS for acquisition and approved by the City Council could proceed with condemnation proceedings. *See* Pls.' Exs. 21, 23. In opposition to this proposal, an attorney for lessees in the Kahala Beach Apartments voiced opposition because such amendment would

> kill the possibilities of additional individuals moving forward. These people are under contract with the City and the City is required to take best efforts to go forward to consummate the transaction. By ripping out Chapter 38, that is not best efforts and at the very least a breach of contract will be in place for those at the Kahala Beach [Apartments] and Admiral Thomas.

Pls.' Ex. 20 at 13. The City Council nonetheless voted 6–3 in favor of incorporating Mee's language and the repeal ordinance, Ordinance 05–001, became law on February 9, 2005. Pls.' Ex. 26.

> As enacted, Ordinance 05–001 provides: This ordinance shall not affect any eminent domain proceeding for the acquisition of units validly designated in projects, the condemnation of which units was approved by the council by resolution before the effective date of this ordinance. Such an eminent domain proceeding may be instituted or, if already instituted, continued after the effective date of this ordinance in accor-

dance with Chapter 38, ROH, as existing on the day before the effective date of this ordinance "Valid designation" means a designation of specific units in a development for leasehold conversion and subsequent approval for condemnation by the council that complied with Chapter 38, ROH, as existing on the day before the effective date of this ordinance . . . .

*Id.* ¶ 3(a). Due to Ordinance 05–001, Group 3 Plaintiffs can no longer continue to seek the fees for their properties despite their Contracts with Defendant.

## B. Procedural Background

Plaintiffs filed their Complaint on February 8, 2007, and a First Amended Complaint ("FAC") on February 26, 2007, alleging claims titled (1) Contracts Clause, U.S. Const., Art. 1, § 10; (2) Substantive Due Process, U.S. Const., amend. XIV; (3) Violation of Federal Rights Under Color of State Law; (4) Breach of Contract; (5) Breach of Implied Covenant of Good Faith and Fair Dealing; (6) Specific Performance; (7) Promissory Estoppel; (8) Equitable Estoppel; (9) Declaratory Relief; (10) Injunctive Relief; and (11) Willful and Wanton Conduct, Punitive Damages. On September 7, 2007, the court granted FUMC's Motion for Leave to Participate as Amicus Curiae in Support of Defendant.

On January 17, 2009, Plaintiffs filed their Motion for Partial Summary Judgment on Counts I and III of the FAC. On March 13, 2009, Defendant filed its Motion for Partial Summary Judgment on Counts I–III of the FAC. On March 24, 2009, the parties filed Oppositions and FUMC filed a Memorandum regarding Plaintiffs' Motion for Partial Summary Judgment. On March 31, 2009, the parties filed Replies and Plaintiff filed a Response to FUMC's Memorandum.[3] A hearing was held April 20, 2009.

---

3. Plaintiffs request the court to strike FUMC's

Memorandum because it creates, enlarges,

### III. STANDARD OF REVIEW

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Rule 56(c) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir.1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir.2007) (citing *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir.2004). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir.2008) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir.2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." (citations omitted)).

### IV. DISCUSSION

The parties dispute whether Ordinance 05–001 improperly cut off Plaintiffs' contractual rights to the fee interests in their leaseholds at the Admiral Thomas. Defendant argues that Ordinance 05–001 did not impair the parties' Contracts and was reasonably related to a legitimate purpose such that summary judgment should be granted in its favor on Count 1, violation of the Contracts Clause, Count II, violation of substantive due process, and Count III, violation of 42 U.S.C. § 1983. In comparison, Plaintiffs seek summary judgment on Counts I and III on the basis that Ordinance 05–001 substantially impaired their rights under the Contracts. Based on the following, the court finds that Ordinance 05–001 does not violate the Contracts Clause or Plaintiffs' substantive due process rights.

---

and extends issues before the court. *See* Pls.' Reply to FUMC Mem. 2–3. Because the court bases its decision on only those issues raised by the parties and FUMC's Memorandum's analysis addresses these issues, the court DE-

NIES Plaintiffs' request to strike FUMC's Memorandum. The court does not consider FUMC's Memorandum, however, to the extent it raises issues not addressed by the parties.

## A. Count I: Violation of the Contracts Clause

### 1. Framework

The Contracts Clause of the Constitution provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." U.S. Const. Art. 1 § 10. Despite its seemingly absolute language, the Supreme Court has explained " 'that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected.' " *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978) (quoting *Manigault v. Springs*, 199 U.S. 473, 480, 26 S.Ct. 127, 50 L.Ed. 274 (1905)). The Contracts Clause does, however, "impose *some* limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." *Id.* at 242, 98 S.Ct. 2716; *see also Matsuda v. City & County of Honolulu*, 512 F.3d 1148, 1152–55 (9th Cir.2008) ("Despite the sweeping terms of its literal text, the Supreme Court has construed this prohibition narrowly in order to ensure that local governments retain the flexibility to exercise their police powers effectively.").

"When a state's action interferes with its own contractual obligations, as opposed to mere private contracts, the [Supreme Court] has made clear that [the court must] examine the state's conduct with a higher level of scrutiny." *Matsuda*, 512 F.3d at 1152 (citing *United States Trust Co. v. New Jersey*, 431 U.S. 1, 20–21, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977)). The Ninth Circuit has specifically found that this heightened scrutiny test applies to Ordinance 05–001, requiring the court to consider:

(1) "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship," *Energy Reserves Group, Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) (citations and internal quotation marks omitted); (2) whether the state law is justified by a "significant and legitimate public purpose," *id.*; and (3) whether the impairment resulting from the law is both "reasonable and necessary to fulfill [such] public purpose." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889–90 (9th Cir.2003) (per curiam) (citations and internal quotation marks omitted).

*Id.*

In applying this heightened scrutiny test, the court may stop its inquiry at the first factor if the state law at issue only minimally impairs the contractual relationship. As explained by the Supreme Court:

> The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation.

*Allied Structural Steel Co.*, 438 U.S. at 245, 98 S.Ct. 2716 (footnote omitted). Based on the analysis below, the court finds that no genuine issue of material fact exists that Ordinance 05–001 impairs the Contracts and therefore addresses only this factor.

### 2. Application of Framework—Substantial Impairment of Contract

■ To determine whether Ordinance 05–001 substantially impairs the parties' contractual relationship, the court must answer three questions: "(1) 'whether there is a contractual relationship'; (2)

'whether a change in law impairs that contractual relationship'; and (3) 'whether the impairment is substantial.'" *Matsuda*, 512 F.3d at 1155 (quoting *Seltzer v. Cochrane*, 104 F.3d 234, 236 (9th Cir.1996)). There is no dispute that a contractual relationship existed between the parties—Defendant represented that the Contracts are valid and enforceable, and corporation counsel approved the form and legality of the Contracts. Pls.' CSF ¶¶ 6–7. Accordingly, at issue is whether Ordinance 05–001 actually impaired the parties' rights and obligations under the Contracts.

■ Turning to the language of the Contracts, each Contract provides that each Plaintiff "agrees to accept from the City, and the City agrees to convey to [the individual Plaintiff], the [leased fee interest in the Admiral Thomas] on the terms stated in [the Contract]." Pls.' Exs. 3a–t. The terms stated in the Contract include, among other things, Chapter 38 and its Rules, which the Contracts explicitly incorporate by reference. *Id.* at Ex. A ¶ 5.

Chapter 38 and its Rules outline a long process before the City determines whether to exercise its eminent domain power and the Contracts are merely the first step in this process. As explained above, after the lessees fill out applications and sign their Contracts, (1) the Director grants or denies preliminary approval based on the applications; (2) after conducting a public hearing, the Director makes a finding of whether the exercise of eminent domain is in the public interest and if appropriate, grants his final approval; (3) the Director designates the relevant portions of the development for acquisition; and (4) the Director requests corporation counsel to prepare and present to the City Council a resolution for the exercise of the power of eminent domain.

While the successful completion of these steps gets the lessees closer to the City's exercise of its eminent domain power, a final, necessary step is that the City Council pass a resolution determining that a public purpose exists for the exercise of eminent domain power. The City Council alone must make this final public purpose determination—the Hawaii state legislature delegated the eminent domain power to each County, *see* Hawaii Revised Statutes ("HRS") § 46–1.5(6) ("Each county shall have the power to exercise the power of condemnation by eminent domain when it is in the public interest to do so."), and specified that condemnation proceedings may be instituted only after the City Council "has authorized such suit by resolution duly passed, or adopted and approved, as the case may be." HRS § 101–13.

That the City Council must determine whether the public purpose necessitates the exercise of eminent domain is confirmed in the City Charter, which provides:

> Section 3–110. Condemnation—The council shall by resolution determine and declare the necessity of taking property for public purposes, describing the property and stating the uses to which it shall be devoted.

Pursuant to the plain words of the City Charter, the City cannot exercise its eminent domain power until it passes a resolution finding that a public purpose *necessitates* the acquisition. In contrast, Chapter 38 on its own does not grant the City eminent domain power—it was enacted by ordinance, not resolution, and it is not specific to the property at issue. Nor does the Director's designation on its own authorize eminent domain power—it is not a resolution and is not a substitute for the City Council. Accordingly, the City Council's passing of a resolution finding a public purpose is an integral, necessary step to the Chapter 38 process.

The Hawaii Supreme Court has reinforced that it is the City Council, and not

any other body, that has discretion in determining whether to exercise eminent domain power. In *Richardson v. City & County of Honolulu*, 76 Hawai'i 46, 868 P.2d 1193 (1994), the fee holder argued that Chapter 38 impermissibly delegated the City's eminent domain power to the DCS. *Richardson*, 76 Hawai'i at 57, 868 P.2d at 1204. Rejecting this argument, *Richardson* explained that the DCS designation was only a preliminary step and that the City maintained its authority in determining whether to exercise eminent domain power:

> ... Although the Department is empowered to *designate* land for acquisition pursuant to these sections, by their very terms the Department merely *facilitates* the City's acquisition of the land subject to the decision of the City, through its City Council, actually to *exercise* the power of eminent domain as prescribed by HRS §§ 101–13 and 101–14. In other words, the sections accord the Department the authority to *assist* the City's statutorily designated "governing authority" in the ultimate exercise of that power; they do not, and cannot, confer the power to condemn land on the Department itself.
>
> Because the Department's mere designation of land, as a means of facilitating its acquisition by the City, is only a preliminary step in the condemnation process that precedes the institution of eminent domain proceedings at the behest of the City Council, we hold that Ordinance 91–95 does not entail the sort of impermissible delegation of the power of eminent domain from the City Council to the Department that would violate HRS § 101–13.

*Id.* at 58–59, 868 P.2d at 1205–06. The Hawaii Supreme Court again addressed this issue in *Sherman*, and, relying on *Richardson*, reiterated that Chapter 38 "does not mandate that the City condemn the [property designated by the DCS]." *Sherman*, 110 Hawai'i at 70, 129 P.3d at 573.

*Richardson* and *Sherman* confirm what is implicit in Chapter 38—that the City Council can refuse to exercise its eminent domain power even if a lessee completes all the prior Chapter 38 steps and the DCS designates the property under Chapter 38. Because the City Council has this discretion in determining whether to adopt a resolution pursuant to Chapter 38, the Contracts, which incorporate the provisions of Chapter 38, recognize that the City Council may choose not to exercise the City's eminent domain power.

By incorporating Chapter 38, the Contracts contemplate that a condemnation proceeding cannot begin until all of these steps are successfully completed. Critically, however, the Contracts make no promises regarding the completion of each of these steps or whether a condemnation action will actually commence for each Plaintiff. Rather, the Contracts require only that Defendant uses its "best efforts to consummate the transaction." Pls.' Ex. 3a-t ¶ 12. Given that these Contracts were merely the first step in this long procedure, this "best efforts" requirement can hardly be construed as meaning that the DCS was contract-bound to blindly approve Plaintiffs' applications, designate the properties for acquisition, and request corporation counsel to propose a resolution for the City Council. Nor can such language be construed as forcing the City Council to find a public purpose supporting the exercise of eminent domain power for such Contracts. The Contracts therefore retained Defendant's right *not* to use its eminent domain power where there was no public purpose supporting its use.[4]

---

4. Indeed, the City cannot exercise its eminent     domain power where there is no public pur-

In this action, the City Council passed resolutions finding that a public purpose existed for using its eminent domain power for Group 1 and 2 Plaintiffs, but the Director never requested that the City Council pass a resolution regarding Group 3 Plaintiffs. Instead, the City Council found that there was no longer a public purpose to support Chapter 38 and therefore repealed it by enacting Ordinance 05–001. *See* Pls.' Ex. 26 ("The council finds that mandatory conversion of multi-family residential leaseholds under Chapter 38 is no longer needed to assuage the social and economic problems mentioned in Ordinance 91–95 and, therefore, no longer advances a public purpose for which the city should exercise its extraordinary powers of condemnation."). Pursuant to the Contracts incorporating Chapter 38 and its Rules, the City Council retained its discretion in determining whether a public purpose supported Chapter 38 eminent domain.[5] In sum, because the Contracts recognize that acquisition was contingent

on a public purpose supporting eminent domain power, the court finds that the City Council's determination of no public purpose through enactment of Ordinance 05–001 did not impair the parties' contractual relationship.[6]

In opposition, Plaintiffs make a number of arguments for why Ordinance 05–001 impaired the Contracts, none of which is persuasive. First, Plaintiffs argue that the City Council did not have discretion to reject a resolution adding Group 3 Plaintiffs to the Condemnation Action because the DCS had "the sole authority to determine whether acquisition of a condominium development's leased fee interest will effectuate Chapter 38's public purpose." Pls.' Opp'n 19. Because the DCS had already found that the exercise of eminent domain was in the public interest for Group 3 Plaintiffs, Plaintiffs argue that the City Council had no discretion to find no public purpose. *Id.* at 19–20. Plaintiff's argument is unsupported by Chapter 38 and the caselaw interpreting it.

pose. *See Haw. Housing Auth. v. Midkiff*, 467 U.S. 229, 245, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void."). Had the City Council authorized condemnation on behalf of Group 3 Plaintiffs without a finding of public purpose, FUMC would have likely challenged the action under the takings clause.

5. The court recognizes that *Matsuda* noted that "it is unclear whether the repeal of Chapter 38 under a mechanism such as Ordinance 05–001 was contemplated under the [Contracts]." *Matsuda v. City & County of Honolulu*, 512 F.3d 1148, 1155 n. 7 (9th Cir.2008). The court bases its decision, however, not on whether the Contracts contemplated a repeal of Chapter 38, but rather on the finding that the Contracts contemplated that the City Council must use its discretion to find a public purpose before an eminent domain proceeding can commence. To construe the Contracts otherwise would allow a private taking and be contrary to law. *See Midkiff*,

467 U.S. at 245, 104 S.Ct. 2321 ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void.").

6. Plaintiffs do not argue that the City improperly determined that Chapter 38 should be repealed because the public purpose supporting eminent domain no longer existed, and there is no evidence on the record to support such conclusion. Rather, Plaintiffs argue only that the DCS already made the public purpose determination for Group 3 Plaintiffs. As the court finds, however, such determination is not a replacement for the City Council's passing of a resolution finding a public purpose.

Nor do Plaintiffs argue that the City Council passed Ordinance 05–001 for the improper purpose of preventing Group 3 Plaintiffs from joining the Condemnation Action. Indeed, there is no evidence to support such inference, and the court therefore does not consider how such facts would change its analysis.

Contrary to Plaintiff's argument, Chapter 38 contains no language granting sole authority to the DCS to determine whether to exercise eminent domain power and actually recognizes the City Council's necessary role in exercising eminent domain power. While it is true that Chapter 38 requires the Director to make a determination whether acquisition of leased fee interests is for a public purpose, Pls.' Ex. 3, Rules ¶ 2–7, Chapter 38 also recognizes that a condemnation proceeding cannot begin until the City Council adopts a resolution authorizing such action. *See id.* ¶ 2–12 (stating that the Director must "request the corporation counsel to prepare and present to the City Council a Resolution for the exercise of the power of eminent domain for the condemnation of the legal and equitable owner of the leased fee interest [and] request corporation counsel to file the necessary legal action . . .").

Further, nothing in Chapter 38 states that the City Council is obligated to adopt resolutions proposed by the DCS or that the DCS's findings of public purpose are those of the City Council. Indeed, such requirement would conflict with HRS § 101–13 and § 3–110 of the City Charter, which require the City Council, and not any other government body, to adopt a resolution finding that a public purpose supports the exercise of eminent domain

power. Reading such requirement into Chapter 38 and/or the Contracts would also conflict with the Hawaii Supreme Court's pronouncement that the City Council, and not the DCS, has the ultimate authority in determining whether to use its eminent domain power.[7] *See Richardson,* 76 Hawai'i at 58–59, 868 P.2d at 1205–1206; *Sherman,* 110 Hawai'i at 70, 129 P.3d at 574.

Plaintiffs also argue that Ordinance 05–001 substantially impaired the Contracts because Defendant had an obligation to use its best efforts to acquire the fee for Plaintiffs and could have repealed Chapter 38 while at the same time allowing Group 3 Plaintiffs to join the Condemnation Action.[8] Pls.' Opp'n 36–42. Plaintiffs' argument ignores that once the City Council determined that Chapter 38 was no longer supported by a public purpose, the City Council could no longer use its eminent domain power pursuant to Chapter 38. Unlike the Group 1 and 2 Plaintiffs, the City Council never determined that a public purpose existed for acquiring the properties for Group 3 Plaintiffs. With no public purpose supporting acquisition for Group 3 Plaintiffs, the City Council could not use its eminent domain power.

Finally, Plaintiffs argue that the City Council's discretion under Chapter 38 is irrelevant because the City Council never

---

7. Plaintiffs also argue that the City Council lacks discretion because the City Council's adoption of a resolution is an administrative, as opposed to legislative, act, *see* Pls.' Opp'n 21 (citing *Kaahumanu v. County of Maui,* 315 F.3d 1215 (9th Cir.2003)), and the City Council has never rejected a proposed resolution regarding Chapter 38. Pls.' Reply 6. The court rejects these arguments out of hand because they have no bearing on whether the City Council retains discretion to exercise its eminent domain power. Further, City Charter § 3–110 requires, in all condemnation actions, that the City Council "by resolution determine and declare the necessity of taking property for public purposes. . . ."

8. Plaintiffs further argue that Defendants failed to use best efforts and/or breached the implied covenant of good faith and fair dealing when it failed to take steps to timely add Group 3 Plaintiffs to the Condemnation Action. Pls.' Opp'n 36–42; Pls.' Reply 7–10. This argument, however, conflates the Contracts Clause allegations with the breach of contract claim. Because this argument is directed to whether Defendant otherwise breached the Contracts as opposed to whether Ordinance 05–001 impaired the Contracts, the court does not address this argument.

actually exercised its discretion by determining whether to enact a resolution regarding Group 3 Plaintiffs. Pls.' Reply 2–3. The court disagrees. While the City Council never received a proposed resolution from corporation counsel, its determination that there was no longer a public purpose supporting Chapter 38 acquisition was the equivalent of finding that no public purpose supported acquisition for Group 3 Plaintiffs.

In sum, the court finds that Ordinance 05–001 did not impair the parties' contractual relationship and therefore GRANTS Defendant's Motion for Summary Judgment on Count I of the FAC, and DENIES Plaintiffs' Motion for Summary Judgment on Count I of the FAC.

### B. Violation of Plaintiffs' Substantive Due Process Rights

■ Plaintiffs claim that Defendant violated their substantive due process rights by enacting Ordinance 05–001, which interfered with their Contract rights. Pls.' Opp'n 43. Because Ordinance 05–001 does not use "a suspect classification [or] draw[] distinctions among individuals that implicate fundamental rights," Plaintiffs must show that Ordinance 05–001 is "not rationally related to a legitimate governmental purpose." *Matsuda*, 512 F.3d at 1156 (quotations omitted). *Matsuda* explains that Plaintiffs have an "extremely high" burden:

> To prove that the City's enactment of Ordinance 05–001 violated their substantive due process rights, the Lessees must demonstrate first that their contracts were the type of property the Due Process Clause protects and, second, that the City deprived them of their rights under the contracts in a way that "shocks the conscience" or "interferes with rights implicit in the concept of ordered liberty." *Nunez v. City of L.A.*, 147 F.3d 867, 871 (9th Cir.1998) (quoting [*United States v. Salerno*, 481 U.S. 739,

746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ] ).

*Id.*

Without deciding whether Plaintiffs had protectable property interests in their Contracts at the time the City Council enacted Ordinance 05–001, there is no genuine issue of material fact that Ordinance 05–001 was rationally related to a legitimate government purpose. In deciding to repeal Chapter 38, the City Council expressly found that there was no longer any public purpose supporting the exercise of eminent domain to acquire the fee for long-term leaseholds. Specifically, Ordinance 05–001 found that "mandatory conversion of multi-family residential leaseholds under Chapter 38 is no longer needed to assuage the social and economic problems mentioned in Ordinance 91–95." Pls.' Ex. 26. There is no evidence on the record that this reason is not legitimate and Plaintiffs do not question this reason, but rather only how Ordinance 05–001 affects Group 3 Plaintiffs. Pls.' Opp'n 46–47. As described above, however, the City Council never found that a public purpose supported acquisition of property for Group 3 Plaintiffs and the Contracts retained the City's discretion in making such finding. Accordingly, Ordinance 05–001 neither "shocks the conscience" nor "interferes with rights implicit in the concept of ordered liberty" and is therefore reasonably related to its purpose of repealing Chapter 38. The court GRANTS Defendant's Motion for Partial Summary Judgment on Count II of the FAC.

### C. 42 U.S.C. § 1983

42 U.S.C. § 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. Because the court grants Defendant's Mo-

tion for Partial Summary Judgment on Plaintiffs' constitutional claims, Plaintiffs no longer have a basis for their § 1983 claim. Accordingly, the court GRANTS Defendant's Motion for Partial Summary Judgment on Count III of the FAC and DENIES Plaintiffs' Motion for Partial Summary Judgment on Count III of the FAC.

### D. Supplemental Jurisdiction Over Remaining State Law Claims

The court "may decline to exercise supplemental jurisdiction over a claim ... if ... (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). "[W]hen deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)).

Plaintiffs' remaining claims are state law claims for breach of contract (Count IV), breach of implied covenant of good faith and fair dealing (Count V), specific performance (Count VI), promissory estoppel (Count VII), equitable estoppel (Count VIII), declaratory relief (Count IX), injunctive relief (Count X), and willful and wanton conduct, punitive damages (Count XI). The court finds that the considerations of judicial economy, convenience, fairness, and comity weigh in favor of the court declining jurisdiction over these state law claims.

### V. CONCLUSION

Based on the above, the court GRANTS Defendant's Motion for Partial Summary Judgment on Counts I–III of the FAC and DENIES Plaintiffs' Motion for Partial Summary Judgment on Counts I and III

of the FAC. Pursuant to 28 U.S.C. § 1367(c), the court declines jurisdiction over Plaintiffs' remaining state law claims (Counts IV–XI) and DISMISSES these claims without prejudice to Plaintiffs filing in Hawaii state court.

IT IS SO ORDERED.